OPINION OF THE COURT
Alexander, J.
Plaintiffs argue on this appeal that the Board of Estimate of the City of New York, the "lead” agency for the purposes of the State Environmental Quality Review Act (SEQRA) failed to take a "sufficiently hard” look at the environmental impact of a proposed urban renewal project *566 known as the Atlantic Terminal Project. Specifically, they contend that the Board of Estimate (BOE) failed to properly evaluate the secondary displacement of local residents which plaintiffs assent will result from approval of the project. The record demonstrates, however, that this issue was extensively examined and given a "hard look” such that the BOE was able to and did make a reasoned elaboration of the proposed project’s impact upon the secondary displacement of local residents. Accordingly, the mandates of the statute have been satisfied and we therefore affirm the order of the Appellate Division.
I
The Atlantic Terminal Urban Renewal Area and the Brooklyn Center Urban Renewal Area were created by the City of New York in 1968 and 1970, respectively. The original urban renewal plan called for the removal of structurally unsound buildings and the construction of new housing units as well as parks and other community facilities. According to the original plan, 2,400 new housing units were to be constructed, including 1,000 units earmarked for low-income residents. Only 806 units have been constructed to date, which include only 300 units for low-income residents. The Atlantic Terminal Project (ATP), was planned in 1978 and is located on a 24-acre site which overlaps both these urban renewal areas. The ATP site is located on mostly vacant land near the Long Island Railroad Terminal in Brooklyn.
In 1985, the City, acting through the New York City Public Development Corporation, entered into a sole source agreement with defendant Rose Associates, a private developer, to develop the ATP site. The Rose proposal for the ATP site includes a mix of commercial and residential uses. When complete, the ATP is to contain 4.5 million square feet of commercial space including two large office towers, movie theaters, a supermarket and parking garages. The residential component of the ATP is to contain 641 units of condominium type housing, which is earmarked for families with annual incomes ranging from $25,000 to $48,000. The housing is to be constructed with the New York City Housing Partnership, a nonprofit organization which will apply for Federal subsidies for 273 of the 641 units. In addition, Rose estimates that another 182 units will be eligible for State subsidies under New York State’s Affordable Home Ownership Program. The *567 plan does not, however, provide for the construction of any housing targeted for low-income residents.
As required by the City’s Uniform Land Use Review Procedure (New York City Charter § 197-c), several levels of municipal approval were required before the plan could be implemented. Applications were duly made by the Public Development Corporation, the Department of Housing Preservation and Development and Rose Associates for various zoning changes, including special permits and amendments to the urban renewal plan, the City map and the zoning map. Since the ATP would also impact upon the environment, final approval of the project also depended upon the results of the preparation of an environmental review and the issuance of impact statements in compliance with SEQRA and the City Environmental Quality Review Act (CEQR). In accordance with CEQR, which implements SEQRA in the City of New York, the Department of Environmental Protection (DEP) and the Department of City Planning (DCP) were designated the "co-lead” agencies concerning the ATP, with responsibility for the preparation of the necessary environmental impact statements (see, Mayoral Executive Order No. 91 § 1 [k] [Aug. 24, 1977]).
Thereafter, DEP and DCP supervised the preparation of a draft environmental impact statement (DEIS). The issue of secondary displacement was raised at the preliminary "scoping” hearing, and although the issue was not expressly addressed in the DEIS, the statement did contain demographic data demonstrating a trend of "gentrification” already in progress in the neighborhood. On July 9, 1986, after a notice had been published in the New York Post, a public hearing on the DEIS was held by the City Planning Commission (CPC). After the hearing, the period for public comments remained open through July 21, 1986. At the hearing and in the subsequent public comment period, several questions, comments and opinions were raised as to the effect of the ATP on low-income housing in the surrounding area, particularly, the possibility of the secondary displacement of these residents. A draft response to these comments, prepared by outside consultants for inclusion in the final environmental impact statement (FEIS), concluded that the ATP would not cause any significant secondary displacement. Rather than merely accepting this conclusion, DCP ordered that additional information be gathered on the issue of secondary displacement. In response, outside consultants made a further inquiry and *568 analyzed relevant data from the City’s computer data bank. These consultants informed DCP that, according to the 1980 census data, the ATP study area contained 2,850 dwelling units in three-to-five-family homes and an additional 4,907 single-room occupancy (SRO) units. The census data indicated that 80% of the housing in the study area was not vulnerable to secondary displacement, either because it was protected by rent stabilization (buildings with six or more units) or because it consisted of owner-occupied one- and two-family homes. The consultants indicated, however, that not all the remaining 20% were vulnerable to secondary displacement because of a variety of factors, including (1) a 13% vacancy rate, (2) tenants in occupancy since the late 1960’s were protected by rent control, (3) the likelihood that some of the buildings had already been upgraded over the past 10 years, thus precluding their occupancy by low- and moderate-income tenants, (4) virtually all the SRO units were protected by the City moratorium on the conversion or demolition of such housing then in effect,[1] and (5) in any event, a current survey of the area revealed that only 44% of the SRO units identified in the 1980 census data were in fact used as such. In addition, DCP personnel conducted an independent block-by-block survey of the study area and further confirmed that the ATP would not have a significant impact on the secondary displacement already in progress there.
Thereafter DCP and DEP concluded that the ATP would not have a significant impact on secondary displacement and, on August 8, 1986, issued a final notice of completion of the FEIS. In addition to the demographic data demonstrating the established trend toward redevelopment and higher rents in the study area, the FEIS included a "Response to Comments” chapter which expressly addressed the issue of secondary displacement. In its response to the comments regarding the issue of secondary displacement the FEIS evaluates the problem and concludes that the ATP "would not be reversing or modifying established land use and development trends” and therefore that the ATP would "not be responsible for triggering significant secondary displacement.” The DEP and DCP then circulated the FEIS to the City BOE and other agencies. On August 18, 1986, the CPC approved the ATP and recom *569 mended approval by the BOB. Following another public hearing which extensively addressed the issue of secondary displacement, on October 9, 1986, the BOB approved the ATP, as well as the FEIS, zoning changes, amendments to the urban renewal plan, and the conveyance of land pertaining to it.
Plaintiffs commenced this action for declaratory and injunctive relief, seeking to annul the BOE’s October 9, 1986 approval of the ATP. Supreme Court granted defendants’ motion for summary judgment and dismissed the complaint in its entirety. A divided Appellate Division affirmed, and plaintiffs appeal to this court as of right (see, CPLR 5601 [a]).
On this appeal, plaintiffs argue that the proper lead agency, the BOE, failed to comply with both the substantive and procedural requirements of SEQRA. They contend that the BOE failed to comport with the substantive requirements of SEQRA because the agency failed to take a "hard look” at the proposed project’s impact on secondary displacement and consequently failed to undertake a "reasoned elaboration” of the issue. Plaintiffs also assert a procedural violation of SEQRA, contending that the BOE improperly delegated its decision-making authority to the DEP and the DCP. Additionally, as an independent basis for reversal, plaintiffs urge that approval of the ATP was not given in accordance with a comprehensive plan for the City of New York (see, Udell v Haas, 21 NY2d 463, 469).
II
The primary purpose of SEQRA is "to inject environmental considerations directly into governmental decision making” (Matter of Coca-Cola Bottling Co. v Board of Estimate, 72 NY2d 674, 679). To that end, the statute mandates the preparation of an environmental impact statement (EIS) when a proposed development project "may have a significant effect on the environment” (ECL 8-0109 [2]). Pursuant to the statutory procedure, a draft EIS (DEIS) is prepared and, after a comment period and any public hearings deemed necessary by the agency, is reevaluated to determine in what way, if any, the EIS should be revised or supplemented so as to adequately address issues raised by the comments (ECL 8-0111 [6]; 8-0105 [7]; 8-0109 [2]; 6 NYCRR 617.8 [g]). The agency then files a final EIS (FEIS) and, after a final comment period and any appropriate public hearings, the agency must make express findings that SEQRA’s requirement’s have been met (ECL 8- *570 0109 [8]). Where two or more agencies are involved in the environmental review process, it is the "lead” agency which must assess the environmental impact of a proposed action (ECL 8-0109 [4]; Matter of Coca-Cola Bottling Co. v Board of Estimate, 72 NY2d, at 680, supra). In addition to these procedural requirements, SEQRA also imposes substantive requirements, delineating the content of the EIS (ECL 8-0109 [2]) and requiring the lead agency to "act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects” (ECL 8-0109 [1]; see generally, Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417).
Judicial review of a lead agency’s SEQRA determination is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination "was affected by an error of law or was arbitrary and capricious or an abuse of discretion” (CPLR 7803 [3]; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 363; Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d, at 416, supra). In assessing an agency’s compliance with the substantive mandates of the statute, the courts must "review the record to determine whether the agency identified the relevant areas of environmental concern, took a 'hard look’ at them, and made a reasoned elaboration’ of the basis for its determination” (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d, at 417; see also, Chinese Staff & Workers Assn. v City of New York, 68 NY2d, at 363-364, supra; Aldrich v Pattison, 107 AD2d 258, 265; H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, 232). An agency’s compliance with its substantive SEQRA obligations is governed by a rule of reason and the extent to which particular environmental factors are to be considered varies in accordance with the circumstances and nature of particular proposals (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d, at 417, supra). Similarly, agencies have considerable latitude evaluating environmental effects and choosing between alternative measures (id.). While judicial review must be meaningful, the courts may not substitute their judgment for that of the agency for it is not their role to "weigh the desirability of any action or [to] choose among alternatives” (id., at 416).
*571 A
Plaintiffs argue that the lead agency, in this case the BOE, failed to comply with the substantive requirements of SEQRA because the agency did not take a "hard look” at the ATP’s impact on the secondary displacement of local residents and further failed to make a "reasoned elaboration” of the basis for its determination that the ATP would not trigger significant secondary displacement.[2] As plaintiffs concede that the agency "looked” at the issue of secondary displacement, this case requires this court to determine when an agency has given sufficient consideration to an environmental issue to constitute the required "hard look” at the subject. Since it is not the court’s role to evaluate de novo the data presented to the agency, the court must, as with substantive SEQRA obligations generally, be guided by a rule of reason and refrain from substituting its judgment for that of the agency. Thus challenges to the conclusions drawn from the data presented requiring such a substitution of judgment will likely fail.
Nevertheless, an agency, acting as a rational decision maker, must have conducted an investigation and reasonably exercised its discretion so as to make a reasoned elaboration as to the effect of a proposed action on a particular environmental concern (see, HO.M.E.S. v New York State Urban Dev. Corp., 69 AD2d, at 231, supra). Thus, while a court is not free to substitute its judgment for that of the agency on substantive matters, the court must ensure that, in light of the circumstances of a particular case, the agency has given due consideration to pertinent environmental factors. This determination is best made on a case-by-case basis and we need not and do not delineate the precise parameters of the hard look doctrine beyond our holding here. Upon a careful review of the record before us, we are satisfied that the BOE, acting as the lead agency, gave due consideration to the issue of secondary displacement in approving the ATP.
Before turning to plaintiffs’ specific contentions, we note that the record reveals that the issue of secondary displacement was raised at every level of the SEQRA review process. Although the DEIS did not include a section expressly denomi *572 nated "secondary displacement”, it did analyze and discuss socioeconomic data demonstrating a trend toward a more affluent population base in the ATP study area, an annual appreciation rate of 20% for one-to-four-family brownstone properties in the area, and an increase in owner-occupied housing at the same time that the number of SRO units in the area decreased. The statement concluded that these existing trends would continue with or without the construction of the ATP. The question of secondary displacement and the possibility of its acceleration was extensively discussed in the comments submitted on the DEIS. These commentators argued that the project would accelerate the secondary displacement of low- and moderate-income residents, particularly those residing in SROs or two-to-five-family dwellings which were not protected by rent stabilization. A draft response to these comments was prepared by environmental consultants and submitted to the DCP. This draft response concluded that the ATP would have no significant displacement impacts. Rather than simply accepting this conclusion, however, the DCP rejected the draft response, and directed that additional information be gathered to address the specific concerns raised in the comments. As a result, the consultants submitted an analysis of City census data concluding that considerably fewer dwelling units were vulnerable to secondary displacement by the ATP than had been argued by the comments. The DEIS conclusion that the ATP would not significantly impact on secondary displacement was also confirmed by additional data gathered in block-to-block surveys of the study area conducted by DCP’s own personnel. Additionally, the issue of secondary displacement was further analyzed at the FEIS stage. The comments addressing the issue were appended to the FEIS and a new chapter, entitled "Response to Comments” was added. These responses addressed the specific issues of secondary displacement raised throughout the SEQRA process and repeated by plaintiffs in this litigation. Finally, the issue of secondary displacement was publicly aired at the hearing before the BOE prior to the lead agency’s final approval of the ATP.
Plaintiffs’ primary criticism of the SEQRA review in this case is directed at the substance of the "protected housing study” submitted to the DCP in response to that agency’s request for additional information on the specific concerns about secondary displacement raised in the comments on the DEIS. They contend that this analysis was incomplete and *573 cannot support the ultimate conclusion of the FEIS (accepted by the BOE) that the ATP would not trigger significant secondary displacement. Specifically, they argue that the analysis is incomplete because it did not provide all the specific information on secondary displacement requested by DCP, to wit, the precise number, location, and rent structure of every vulnerable dwelling unit surrounding the project site. While the protected housing study identified the number and location of vulnerable housing units unprotected by rent stabilization, the study frankly conceded that "[a]t this time, it is not really possible to establish an accurate universe of potentially affected low and moderate income households in multiple dwellings with fewer than six units.” The study was able to establish nevertheless that only 20% of all the dwelling units in the study area were unprotected by rent stabilization, and that this entire 20% was not vulnerable to secondary displacement for a variety of factors. While plaintiffs continue to dispute the accuracy of the factors cited in the study, we cannot say that the BOE’s acceptance of this analysis was irrational, nor may we substitute our judgment as to the accuracy of the data presented.
We also reject plaintiffs’ contention that in accepting the study, the DCP irrationally assumed based upon the listed factors, that all potentially vulnerable units were protected from secondary displacement. The appropriate inquiry is not whether the ATP will have any impact on secondary displacement; it is whether, given the information in the study, the ATP will have a significant impact on secondary displacement. Although the protected housing study did not provide all current information on every dwelling unit in the study area, it did provide a basis for a reasoned consideration of the secondary displacement issue. Moreover, before accepting the conclusions of the FEIS based in part on this study and in part" on the independent surveys conducted by DCP personnel, the BOE also considered the contrary information presented in the comments on the FEIS and the responses to those comments. Thus, the record does not support plaintiff’s assertion that the claimed inadequacies in the protected housing study demonstrate that the BOE failed to take the required hard look at the issue.
Similarly unpersuasive is plaintiffs’ additional argument that the SEQRA process here is fatally flawed because the raw data of the protected housing study was not included in the FEIS. There is no requirement that the FEIS contain all the *574 raw data supporting its analysis so long as that analysis is sufficient to allow informed consideration and comment on the issues raised (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d, at 423, supra). We conclude that the FEIS analysis, which emphasized that the ATP would not alter the already established displacement trends in the study area, was sufficient to allow such informed consideration.
Finally, the BOE’s failure to consider the cumulative impact on secondary displacement of the ATP and other, unrelated development projects in the same geographic area does not render the agency’s consideration of the issue deficient. While it was within the agency’s discretion to consider the cumulative impact of such unrelated projects, the agency was not required to do so (6 NYCRR 617.15 [a] [1]); see, Matter of Save the Pine Bush v City of Albany, 70 NY2d 193, 205). We find no allegations in the complaint, nor any evidence in the record, to substantiate plaintiffs’ belated claims that the ATP was in fact integrally related to other development projects in the same geographic area.
Thus the record before us demonstrates that the BOE, acting as the lead agency, took the required hard look at the issues concerning the ATP’s potential impact on the secondary displacement of local residents. Consequently, the agency’s action in approving the ATP cannot be characterized as arbitrary and capricious or an abuse of discretion.
B
Plaintiffs argue alternatively that reversal is nevertheless required because the ATP approval in this case was not given in accordance with lawful SEQRA procedure. Since the BOE was responsible for the final approval of the ATP, the parties agree that it was the proper "lead” agency for the purposes of SEQRA review (see, ECL 8-0109 [4]; 6 NYCRR 617.2 [v]). Plaintiffs contend, however, that the BOE failed to fulfill its function as a lead agency because it improperly delegated that role to two non-decision-making agencies — the DEP and the DCP. Relying on our decision in Matter of Coca-Cola Bottling Co. v Board of Estimate (72 NY2d 674, supra), plaintiffs argue that the designation of the DEP and the DCP as "co-lead” agencies pursuant to Mayoral Executive Order No. 91 violated SEQRA because it insulated the BOE from the consideration of environmental factors required by SEQRA.
Matter of Coca-Cola (supra), however, is inapposite. There, *575 we held SEQRA’s lead agency requirement violated where the DEP, designated a "co-lead” agency by Mayoral Executive Order No. 91, issued a conditional negative declaration requiring modification of a proposed action to alleviate significant environmental effects (see, ECL 8-0109 [2], [4]; 6 NYCRR 617.2 [h]). In so doing, as established by the affirmed findings of the trial court in that case, it was the DEP and not the BOE (the SEQRA lead agency) that made the determination of the proposed action’s environmental impact and thereby insulated the lead agency from its required consideration of environmental factors (Matter of Coca-Cola Bottling Co. v Board of Estimate, 72 NY2d, at 681, supra). We held Executive Order No. 91 contrary to the spirit and form of SEQRA because it operated to remove from the lead agency the determination of the significance of the environmental effect of a given proposal (id., at 682). We noted, however, that lead agencies are "likely to be nonexpert in environmental matters, and will often need to draw on other[] [agencies]” (id.).
Here, the record supports the affirmed finding of the trial court that the BOE, rather than either of the designated "co-lead” agencies, properly fulfilled the function of the lead agency for the purposes of SEQRA. The record reveals that the BOE reviewed and evaluated the DEIS and the FEIS, conducted public hearings on the FEIS, determined that the ATP would not have a significant impact on the environment, and ultimately made the final decision to approve the ATP. Thus unlike Matter of Coca-Cola, the BOE in this case was not insulated from review of the environmental impact of the ATP and properly acted as a lead agency, notwithstanding the designation of the DEP and DCP as co-lead agencies. While the DCP and the DEP were undeniably involved in the SEQRA review process, the trial court found that the BOE merely relied upon the expertise of these agencies, but fully retained and exercised its role as the lead agency assessing the environmental impact of the ATP. This finding, affirmed by the Appellate Division and having support in the record, is beyond our further review (id., at 681).
C
We must also reject plaintiffs’ contention that the land use changes approved for the ATP were not in accordance with a well-considered plan because the project did not provide for low-income housing (see Udell v Haas, 21 NY2d 463, *576 469, supra). As we explained in Asian Ams. for Equality v Koch (72 NY2d 121, 132), such zoning amendments meet the general requirement for a well-considered plan, when, as here, they are "carefully studied, prepared and considered” and are adopted for a legitimate government purpose. Nor is there any requirement that a particular development project include low-income housing (id., at 134-135).
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Wachtler and Judges Simons, Kaye, Hancock, Jr., and Bellacosa concur; Judge Titone taking no part.
Order affirmed, with costs.

. This moratorium was subsequently declared unconstitutional (Seawall Assocs. v City of New York, 74 NY2d 92, cert denied sub nom. Wilkerson v Seawall Assocs., — US —, 110 S Ct 500 [1989]).

. The parties agree that the secondary displacement of local residents, as well as any acceleration of such displacement, is an environmental impact which must be considered during the SEQRA process (see, ECL 8-0105 [6]; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 367 [construing CEQR]).