In the Matter of SUTTON AREA COMMUNITY et al., Appellants, v BOARD OF ESTIMATE OF CITY OF NEW YORK et al., Respondents, and GLICK DEVELOPMENT AFFILIATES, Intervenor-Respondent.

First Department, April 2, 1991

## APPEARANCES OF COUNSEL

*Mitchell S. Bernard* of counsel *(Natural Resources Defense Council,* attorney), for appellants.

*Fred Kolikoff* of counsel *(Larry A. Sonnenshein* with him on the brief; *Victor A. Kovner, Corporation Counsel,* attorney), for respondents.

*Eric Bregman* of counsel *(David Paget* and *Michael D. Zarin* with him on the brief; *Sive, Paget & Riesel, P. C.,* attorneys), for intervenor-respondent.

## OPINION OF THE COURT

ASCH J.

The project which is the subject of our scrutiny is not a modest one-family cottage standing alone in the middle of an unpopulated prairie. The approval by the Board of Estimate was for a massive private development to be built in the center of one of the most congested neighborhoods in Manhattan.

As approved, the project includes twin 44-story towers, proposed construction of 520 luxurious apartments, a 250-room hotel, a shopping mall, office space, two health clubs, a community facility and almost 500 parking spaces. An undertaking of such leviathan proportions must have substantial environmental impact. It was precisely because of the possibility of long-term or cumulative adverse effect that SEQRA (New York State Environmental Quality Review Act [ECL 8-0101 *et seq.]*) was enacted.

On appeal, petitioners raise various challenges to the Board of Estimate determination relating to the outdoor space provided, mitigation variables and various purported adverse environmental impacts arising from the increased use and population on the lot. Most of these factors were adequately addressed by the final environmental impact statement (FEIS) and we find no meaningful basis on which to disturb the administrative determination as to them.

However, with respect to respondents' treatment of one variable, i.e., sewage, there remains a serious issue as to adverse environmental impact, and the manner and the time in which the FEIS was amended to change respondents' notice as to which sewage treatment plant would be utilized.

The developer and various city officials met in March 1985 to prepare various issues in the draft environmental impact statement (DEIS). It was completed on July 1, 1988. Among the infrastructure factors were included drainage, sewage, and waste disposal. A public hearing on the DEIS was held on October 5, 1988. The FEIS was completed on November 4, 1988, and included the comments on the DEIS and responses thereto. The FEIS included discussions on drainage, sewage, and waste disposal. Prior to, and subsequent to, issuance of the FEIS, the project was altered and downscaled in accordance with many of these comments. Most of these issues are not relevant for this appeal. On December 15, 1988, the developer informed the city that the FEIS was incorrect as to the sewage treatment facility which would be utilized. The FEIS had specified that sewage would be directed to the Ward's Island Water Pollution Control Plant. However, the actual destination of sewage would be the Newtown Creek water pollution control plant. On January 9, 1989, the city issued a notice of correction, indicating such change, which was distributed to the Board of Estimate. This plan for disposing of sewage had not been known to those involved in the formulation of the DEIS or the FEIS. Neither did petitioners and others knowledgeable in sewage and waste disposal problems have notice of the change in plants. Three days later, on January 12, the Board of Estimate conducted a hearing at which the petitioners offered comments. Sewage was a topic of this discussion. After the hearing, the Board voted to adopt the resolutions which were relevant to this project.

Petitioners challenge the manner in which this notice of correction was issued, and argue that the principal agency and others who prepared the environmental impact state-

ments did not have this information when they were formulated and that the Manhattan Borough President never received this information. Petitioners also argue that the change actually threatens a significant environmental impact.

There now exists a serious factual question of whether there will be a significant environmental impact in a practical sense under the new proposed plan for sewage disposal and whether those persons or agencies responsible under SEQRA, as well as the Board of Estimate, had an actual opportunity to study its impact.

The Ward's Island treatment plant has a designed capacity of 290,000,000 gallons per day. The FEIS indicates that the project would produce 345,000 gallons per day. Newtown Creek has a designed capacity of 310,000,000 gallons per day. Respondents argue that whether the sewage goes to Ward's or Newtown, it will constitute only a minimal portion of the daily sewage treated. While respondents note that the anticipated sewage is .092% of Ward's actual capacity and only .079% of Newtown's actual capacity, they rely on *actual* capacity, which is far in excess of the designed capacity. In any event, there is another real difference between the two treatment plants. Ward's Island, the originally designated plant, conducts secondary sewage treatment, while Newtown, the plant which will be utilized, does not provide secondary sewage treatment. Respondents point out that the major difference relates to the removal of "two" pollutants, biochemical oxygen demand (BOD) and total suspended solids (TSS). TSS consists of an effluent which is a thin sludge containing heavy metals among other pollutants, while BOD is a measure of the amount of oxygen used up in the water by the decomposition of the organic wastes in the effluent. Actually, then, several potential pollutants are involved. The practical result is that Ward's removes at least 85% of BOD and TSS while Newtown removes at least 50%. Greater quantities of untreated sewage therefore will be dumped in the East River from the Newtown plant than from Ward's plant.

■ The respondents and the dissent conclude that this result is de minimis. But, the various city officials, the expert consultants, the public, as well as the Board of Estimate should have been afforded the opportunity to study the environmental impact of releasing this additional amount of untreated sewage into the East River. In addition, under the terms of a State pollution discharge elimination system permit granted by the New York State Department of Environ-

mental Conservation, the city may be barred from making new sewer connections if the Newtown plant continues to operate on any level beyond its permitted capacity. Thus, an *additional* flow of 345,000 gallons a day cannot be considered de minimis. This seems to undermine any firm conclusion that sewage disposal at Newtown will, at all times, have no more than marginal impact.

Respondents contend that pursuant to a consent decree entered with the State Department of Environmental Conservation in June 1988, a timetable to expand the flow capacity of Newtown Creek has been established with all construction to be completed by December 31, 1996. Assuming the city complies with all the provisions and time limits set forth in the consent decree (which is dubious given the history of government delay and the present fiscal difficulty), it should be noted that Appendix B to the decree allows for a waiver of the interim effluent limitations and even a shutdown of the Newtown plant during construction activities. This does not vitiate our conclusion that all the interested parties should have been afforded an opportunity to study and comment on the proposed change before the Board of Estimate approved the project.

We do not make any determination as to the adequacy of the Newtown Creek proposal. However, in view of these various considerations, it seems imperative to submit the technical and practical issues involved in the disposal of sewage to the appropriate administrative agencies before the plan is passed upon by the entity currently having jurisdiction (i.e., the City Council).

The matter of sewage disposal in New York City today is a serious problem. As the respondents correctly note, the sewer system presents a jurisdictional nightmare discoverable only in ancient records. Several city agencies, as well as private entities such as Con Ed, have jurisdiction over different maps and records. The consultant for the firm which prepared the sanitary valuations in the DEIS and FEIS submitted an affidavit which explained how the initial FEIS specified the wrong treatment plant. The consultant averred that the firm visited and inspected maps with several city agencies and sources including the New York City Bureau of Sewers and Drainage. The consultant became aware of the nonuniform nature of the maps and conflicting data and found it difficult to ascertain which water pollution control plant would treat

the sanitary sewage from the project. During late 1985, the consultants contacted technical personnel from the drainage division of the Department of Environmental Protection to identify the designated treatment plant. The consultant was informed that the Ward's Island plant services most of the upper East Side of Manhattan and would receive sanitary waste from the project. It was not until a meeting of Community Board 6 on December 7, 1988, at which petitioners apparently were present, that a participant raised the question of sewage treatment facilities and indicated her belief that Newtown Creek would be the correct plant. Thereafter, the consultants visited the City Bureau of Sewers and other agencies, reviewed updated and newly created maps and confirmed only then that Newtown Creek would be utilized for the project sewage. The following week, December 15, 1988, DEP was notified of this error, and the consultants participated in the issuance of the notice of correction.

If the error had been corrected well before the meeting of the Board of Estimate, it might not even be a substantive issue on appeal. However, the timing of the notice of correction and the subsequent approval raises an issue. The Board of Estimate was a policy-making body. What was bypassed, therefore, was the administrative expertise and the opportunity for meaningful public input based upon the changed plans. The Board of Estimate, like other administrative agencies, had "considerable latitude evaluating environmental effects and choosing between alternative measures" *(Akpan v Koch,* 75 NY2d 561, 570). "Nevertheless, an agency, acting as a rational decision maker, must have conducted an investigation and reasonably exercised its discretion so as to make a reasoned elaboration as to the effect of a proposed action on a particular environmental concern *(see, H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d, at 231, *supra).* Thus, while a court is not free to substitute its judgment for that of the agency on substantive matters; the court must ensure that, in light of the circumstances of a particular case, the agency has given due consideration to pertinent environmental factors" *(supra,* at 571).

However, here, on January 9, 1989, two months after publication of the FEIS which reported that sewage would be treated at the Ward's Island plant, and three days before the Board of Estimate vote, the city's Department of City Planning and Department of Environmental Protection issued a purported "notice of correction" stating that project sewage

would be treated at the Newtown Creek Water Pollution Control Plant.

■ It would appear that the belated "notice of correction" was not received by the Manhattan Borough President, who sits on the Board of Estimate. To the extent the "notice" was distributed to expert government agencies and members of the public, it was distributed much too late to permit meaningful review or comment on its contents. Last minute notice may be, realistically, the equivalent of no notice. In this case, no notice, or even late notice, may vitiate the mountains of documents, the input of technical experts, the viewpoint of local citizens and the benefits of intensive negotiation, which would perhaps insure the most appropriate handling of the sewage.

The Newtown Creek plant, in contrast to the Ward's Island facility, does not provide secondary sewage treatment, which is the minimum treatment required by State and Federal water pollution control laws. Even at the present time it handles sewage flow in excess of its design and permitted capacity. The "notice of correction" omitted mention of these facts.

The respondents' violation of SEQRA mandates nullification of Board of Estimate approvals for the project. Courts throughout New York State require strict, literal compliance with the requirements of SEQRA. Accordingly, courts have often invalidated government approvals granted in violation of SEQRA. (See, e.g., Matter of E.F.S. Ventures Corp. v Foster, 71 NY2d 359, 371; Matter of Save the Pine Bush v City of Albany, 70 NY2d 193, 206; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 369; Matter of Tri-County Taxpayers Assn. v Town Bd., 55 NY2d 41, 45-46.)

This case highlights the importance of judicial vigilance with regard to compliance with SEQRA. The statute establishes a fundamentally democratic process whereby through draft and final environmental impact studies, accurate and complete information is made available to citizens and agencies with expertise and concern.

Sophisticated developers and compliant officials have learned, however, to maneuver through the requirements of SEQRA and once the levels of review have been climbed, given the limited scope of judicial review, it becomes extremely difficult for the courts in appropriate cases to intervene to protect the public.

Despite the legislative intent that all environmental impacts be identified, investigated, disclosed and considered, the misleading environmental impact statements here precluded informed public or agency comment on sewage treatment plans. In this critical area the key environmental disclosure documents relied on by the Board of Estimate prevented, rather than safeguarded the attention and balancing required by law. This shortcoming deprived the decision makers of a reasoned, lawful basis on which to review the project.

Accordingly, the judgment of the Supreme Court, New York County (Irma Vidal Santaella, J.), entered April 25, 1990, which confirmed the determination of the respondent Board of Estimate of the City of New York, dated January 12, 1989, and dismissed the petition, should be reversed, on the law and facts, and the application for an order nullifying the Board of Estimate approval granted without costs or disbursements.

MILONAS, J. (dissenting). In my opinion, the judgment being appealed herein should be affirmed. The majority's decision that respondents violated the procedural requirements of SEQRA (ECL art 8) and, thus, that the Board of Estimate's approval for the subject development must be nullified is simply not supported by either the facts or the law pertaining to the instant controversy.

The proposed Manhattan project in dispute in this proceeding is to be constructed on a site bounded by East 60th Street on the south, York Avenue on the east, East 61st Street on the north and First Avenue on the west. At the present time, the location houses several garages and other vehicle-related operations, three light industrial/commercial businesses, a nightclub and a five-story residential building. The intervenor-respondent Glick Development Affiliates plans to utilize the space to create a mixed-use development that would consist of a first-class hotel, residential and commercial space, as well as green parks, recreational facilities, outdoor plazas and fountains which, it urges, will transform the currently somewhat blighted Queensboro Bridge area into a more vibrant and attractive community. During the course of the environmental and land use review procedures, the project underwent significant changes directed primarily at scaling down the size of the original proposal.

Following the submission of a project data statement, representatives of various city agencies met with the developer to discuss, among other things, zoning and land use, traffic and

parking, air quality and noise so that the draft environmental impact statement (DEIS) could be prepared. The ensuing DEIS, dated July 1, 1988, considered such matters as land use, building height, displacement of residents and businesses, subsurface contamination, demographics, pedestrian and vehicular traffic, the effect upon historic landmarks, air quality, noise, community services and resources, infrastructure, topography, mitigation of adverse environmental impacts and land use alternatives. A public hearing was thereafter held on October 5, 1988, and written comments were received until October 17, 1988. The final environmental impact statement (FEIS) was completed on November 4, 1988. Not only did it analyze an exhaustive list of relevant issues, but it included the written comments to the DEIS and the responses to both the written and oral observations. A mandated reduction in the scope of the project was incorporated into a restrictive declaration on November 14, 1988 and was recorded with the City Register. Further, the developer was compelled to adopt certain measures to alleviate the anticipated environment effects of the plan.

On December 15, 1988, Glick's consultants advised the city that the FEIS wrongly stated that sewage from the project would be processed at Ward's Island Water Pollution Control Plant when, in fact, it would be handled through the Newtown Creek Water Pollution Control Plant. The city, therefore, issued a notice of correction on January 9, 1989. It should be pointed out that the development was projected to produce 345,000 gallons of sewage per day. The design capacity of Ward's Island is 290 million gallons each day, while Newtown Creek's capacity is 310 million gallons per day. The estimated average sewage to be generated by the project is one tenth of 1% or less of the total capacity of either plant. Although the Ward's Island operation does remove at least 85% of two specific pollutants, and Newtown Creek only eliminates 50% to 60% of these pollutants, treatment at the latter plant will result in the dumping of only marginally more sewage into the East River, and, in any event, the city has entered into a series of consent decrees with the New York State Department of Environmental Conservation obligating itself within an established time period to bring all of its treatment plants into full compliance with legal requirements.

Prior to the public hearing conducted on January 12, 1989, members of the Board of Estimate thoroughly reviewed the

DEIS and the FEIS, as well as numerous documents, statistical surveys, technical reports and other data provided by the Department of City Planning and the Department of Environmental Protection. Indeed, during the course of the SEQRA process, the Board of Estimate, including the Manhattan Borough President's office, was in regular contact with representatives of the city agencies to exchange information and generally discuss various aspects of the proposal. At the hearing itself, which lasted from midmorning until 5:00 A.M. the following day, testimony was offered by public officials, community residents and other interested individuals, representatives of the Glick organization and, significantly, counsel and consultants for petitioners herein. Board of Estimate members questioned the speakers at length about land use, zoning, traffic, air quality, secondary displacement, open space, density, the adequacy of mitigation programs, sewage treatment and other environmental impacts of the project. At the conclusion of the hearing, the Board voted in favor of resolutions necessary to enable the development to proceed.

In challenging the propriety of the Board of Estimate's action, petitioners assert that the FEIS was inadequate in a number of important respects and, moreover, that respondents violated certain SEQRA requirements in approving the project. However, the majority appear to rest their conclusion that the administrative determination should be vacated on the ground that the notice of correction was not properly disseminated to State and local agencies and members of the public with expertise in or concern about sewage treatment matters, and "[to] the extent that the 'notice' was distributed to expert government agencies and members of the public, it was distributed too late to permit meaningful review or comment on its contents." Further, the majority finds that the notice was not received at all by the Manhattan Borough President, a member of the Board of Estimate, an assessment which seems to be based entirely upon an affidavit submitted on behalf of petitioners wherein one of the attorneys employed by the Natural Resources Defense Counsel declares that: "In an attempt to determine whether this late notice had in fact been distributed to Board of Estimate members, on April 19, 1989 I wrote a taxpayer inspection letter to the Manhattan Borough President, in which I specifically requested copies of 'any and all corrections or "errata sheets" to the FEIS.' In response, we received a series of documents, but the sewage treatment 'notice of correction' was not among them. This confirmed the

substance of an earlier telephone comment from a member of the Borough President's staff to the effect that the sewage treatment 'notice of correction' was not in the file."

Thus, the affiant observes, "[w]e do not know whether or when any other Board of Estimate member actually received the January 9, 1989 notice of correction." Similar reasoning was utilized to question whether other interested parties were accorded timely notice. Of course, the majority, in accepting the accuracy of petitioners' unsubstantiated allegations, have evidently overlooked the notice of correction itself, as well as its covering letter, both of which contain an extensive list of persons and agencies who were "cc'd". Since there is no affidavit from anyone with personal knowledge of the facts to contradict the regularity of the notice procedure, it must be presumed that the following were indeed, as specified in the notice of correction, mailed a copy thereof: Sylvia Deutsch, Robert Flahive, Eric Kober, Jack Collins, Lance Michaels, Jeff Sommer, Judy Wattstein, Ed Wagner, Thomas Jarling, Betty Daly, Heidi White, David Dinkins, Lory Alcala, Board of Estimate, City Planning Commission, Jonathan Lindsey, Michael Halle, Dan Coleman, Marvin Roth, Harvey Schultz, Harold Nudelman, John DiMartino, Martin Engelhardt, Jeremy Woodoff, Barbara Rinaldi, Carlos Cuevas, Elinor Schuman, Mary Skinner, Constance Adamec and Vince Morris. For the majority to adopt petitioners' speculations that there was a lack of proper notice in the face of the very real evidence to the contrary is simply without foundation.

In *Akpan v Koch* (75 NY2d 561, 570), the Court of Appeals recently explained that: "Judicial review of a lead agency's SEQRA determination is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination 'was affected by an error of law or was arbitrary and capricious or an abuse of discretion' * * *. In assessing an agency's compliance with the substantive mandates of the statute, the courts must 'review the record to determine whether the agency identified the relevant areas of environmental concern, took a "hard look" at them, and made a "reasoned elaboration" of the basis for its determination' * * *. An agency's compliance with its substantive SEQRA obligations is governed by a rule of reason and the extent to which particular environmental factors are to be considered varies in accordance with the circumstances and nature of particular proposals * * *. Similarly, agencies

have considerable latitude evaluating environmental effects and choosing between alternative measures * * *. While judicial review must be meaningful, the courts may not substitute their judgment for that of the agency for it is not their role to 'weigh the desirability of any action or [to] choose among alternatives' ".

Moreover, in order to satisfy the mandates of SEQRA, it is not necessary that every conceivable environmental impact, mitigating measure or alternative be identified and addressed *(Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 417). The "hard look" standard *(see, Akpan v Koch, supra; Matter of Jackson v New York State Urban Dev. Corp., supra)* "does not authorize a court to conduct a detailed de novo analysis of every environmental impact of, or alternative to, a proposed project which was included in, or omitted from, an environmental impact statement * * *. An agency's substantive obligations under SEQRA must be viewed in light of a rule of reason—the environmental impact statement is to be analytical, not encyclopedic, and the degree of detail with which each factor must be discussed will vary with the circumstances and nature of the proposal * * *. So long as the agency honors its mandate regarding environmental protection by complying strictly with prescribed procedures and giving reasoned consideration to all pertinent issues revealed in the process, the court is not permitted to second-guess the agency's choice" *(Matter of Schiff v Board of Estimate,* 122 AD2d 57, 59, *appeal denied* 69 NY2d 604). Clearly, in the instant situation, the environmental review was in full accordance with both the spirit and substance of SEQRA, a fact which the majority apparently do not dispute. There was extensive public debate and participation during each phase of the process, and the city published and widely distributed a DEIS and FEIS, which contained a thorough analysis of virtually every aspect of the proposal and its possible impact upon the environment. The SEQRA procedure directly resulted in the original plan being modified to eliminate six movie theaters, reduce the building height by over 25%, construct considerably less commercial space and decrease the total square footage of the project. Numerous consultations occurred between representatives of the concerned city agencies, elected officials and their staffs, professionals in the field, local residents, the developer and other interested parties. Consequently, the record demonstrates that the action by the Board of Estimate in approving the project was neither arbi-

trary nor capricious and conformed in all respects to the statutory dictates of SEQRA.

The majority, however, as previously noted, express reservation as to the propriety of the notice of correction, thereby, in their view, rendering the procedure fatally defective. In that connection, 6 NYCRR 617.8, which encompasses the rules and regulations promulgated to implement SEQRA, states, in pertinent part, that:

"(g) *Supplemental EIS's.* (1) Prior to the filing of a findings statement, the lead agency may require a supplemental EIS, limited to specific issues not addressed or inadequately addressed in the EIS, in the following circumstances:

"(i) changes are proposed for the project which may result in a significant adverse environmental effect;

"(ii) newly discovered information arises about significant adverse effects which was not previously addressed; or

"(iii) a change in circumstances arises which may result in a significant adverse environmental effect.

"(2) The decision to require preparation of a supplemental EIS, in the case of newly discovered information, shall be based upon the following criteria:

"(i) the importance and relevance of the information;

"(ii) its probable accuracy; and

"(iii) the present state of the information in the EIS.

"(3) If a supplement is required, it will be subject to the full procedures of this Part."

A supplemental EIS is mandated only where a newly discovered fact is important. Since both Ward's Island and Newtown Creek have overload problems, and the project's sewage would increase the flow to either operation by no more than one tenth of 1% of capacity, it can hardly be argued that the inadvertent error regarding the identity of the treatment plant is sufficiently vital to necessitate the preparation of a supplemental EIS. In any event, "[w]hether or not a modification is significant is generally a decision to be made by the agency after taking a 'hard look' " *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 430). Certainly, it cannot reasonably be concluded herein that the members of the Board of Estimate, including then Manhattan Borough President Dinkins, were not fully informed of all of the pertinent issues, including those dealing with sewage and the relative effects upon the environment that would be caused by

each of the treatment plants. As heretofore mentioned, there is absolutely no support in the record for the majority's finding that adequate notice of the correction was not furnished either to the Manhattan Borough President or any other interested persons or groups.

ROSENBERGER and KASSAL, JJ., concur with ASCH, J.; KUPFERMAN, J. P., and MILONAS, J., dissent in a separate opinion by MILONAS, J.

Judgment, Supreme Court, New York County, entered on or about April 25, 1990, reversed, on the law and facts, and the application for an order nullifying the Board of Estimate approval granted, without costs or disbursements.