OPINION OF THE COURT
Thomas A. Dickerson, J.
Assisted Living Comes to Scarsdale
The CPLR Article 78 Petition[1]
Petitioners’ latest[2] CPLR article 78 petition seeks to nullify certain findings and approvals made by the respondent, the Village of Scarsdale Planning Board, that would allow the respondent, Realm, L.L.C., to construct an assisted living facility (ALF) near the petitioners’ home in an area zoned for residential use. A final environmental impact statement was accepted in April 2002 and a findings statement was adopted by the Planning Board on May 22, 2002. The Planning Board approved the site plan, special use permit, wetlands permit and lot merger on April 23, 2003 and filed its decision with the Village of Scars-dale Clerk on April 24, 2003.
*644 Petitioners contend that the actions of the Planning Board were “arbitrary, capricious, illegal, unsupported by the record, in violation of lawful procedure, unreasonable and in excess of its jurisdiction,”[3] in that (1) the approved use is not permitted within the subject zoning district; (2) the Planning Board failed to properly address the underlying zoning issue during its review process; and (3) the Planning Board violated the State Environmental Quality Review Act (SEQRA) by failing to properly mitigate an identified environmental impact.
Realm’s Assisted Living Facility
The proposed ALF and the petitioners’ home are both located within the AA-1 residential zoning district in the Village of Scarsdale. In early 1998, the Scarsdale Building Inspector, Adolph Orlando, was consulted by Realm concerning a project to build a 115-unit, three-story ALF on a seven-acre parcel located partly in the City of White Plains (1.14 acres) but, primarily, in the Village of Scarsdale (5.83 acres). In fact, all of the project’s buildings would be located on the Scarsdale portion of the site. In reviewing Realm’s application, the building inspector determined, pursuant to Village of Scarsdale Zoning Code § 310-89 (A) (1) and § 310-7 (F) (3) and (4), that the project was a permitted use subject to a special permit in the residence AA-1 district. Petitioners assert that the Planning Board ignored the use restrictions of the Scarsdale Zoning Code arguing that an ALF is not a permitted use in the AA-1 residential zoning district.
The Standard For Review
CPLR 7803 (3) provides that the standard of judicial review of any administrative action or determination is “whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion” (see e.g., Matter of Board of Educ. of Monticello Cent. School Dist. v Commissioner of Educ., 91 NY2d 133, 139 [1997]). The Court of Appeals has defined arbitrary and capricious as being “without sound basis in reason and . . . without regard to the facts” (Matter of Pell v Board of Educ., 34 NY2d 222, 231 [1974]). Therefore, a rule, policy or action is arbitrary and capricious if it is determined to be irrational by the reviewing court (see e.g., New York State Assn. of Counties v Axelrod, 78 NY2d 158, 166 [1991]). However, such a rule, policy or action should be upheld if it has a rational basis and is sup *645 ported, by the record (see e.g., Matter of Cellular Tel. Co. v Rosenberg, 82 NY2d 364, 370 [1993]).
This court may not substitute its judgment for that of the Planning Board unless the decision is patently arbitrary and unreasonable, and constitutes an abuse of discretion (see e.g., Matter of Diocese of Rochester v Planning Bd., 1 NY2d 508, 520 [1956]). The Planning Board’s interpretation of its own regulations is entitled to great deference unless it is unreasonable or irrational (see e.g., Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs., 77 NY2d 753, 758 [1991]).
A Nursing Home By Any Other Name
Pursuant to Scarsdale Zoning Code §§ 310-6 and 310-7 (F) (3), no building or premises shall be used or maintained for any purpose other than the uses permitted. These uses include: a “hospital, sanitorium or nursing home, not including, however, an institution for the care or treatment of animals.” (Scarsdale Zoning Code § 310-7 [F] [3] [emphasis added].) In a memorandum of the Village of Scarsdale Planner, Peter C. Van de Water, submitted to the Planning Board for its May 27, 1998 meeting,[4] the building inspector determined that Realm’s ALF proposal comes within the meaning of a “hospital, sanitorium or nursing home” (emphasis added) and therefore falls within the permitted uses in this AA-1 residential zoning district.
The building inspector reasoned that an ALF is a permitted use because the proposed assisted living units provide the most modest of facilities, communal dining and activities and access to 24-hour medical attention. The “special care” units are serviced as a traditional nursing home with an attended nurses station. According to Mr. Van de Water, the building inspector stated that the ALF would qualify as a permitted use, because it would serve a proposed population which “is the same as would have occupied a nursing home prior to the development of the assisted living concept”[5] (see e.g., Antonik v Greenwich Planning & Zoning Commn., 1999 WL 391049, *17, 1999 Conn Super LEXIS 1745, *47 [Conn Super, June 4, 1999] [finding that the Planning and Zoning Commission of the Town of Greenwich properly exercised its discretion in finding that a proposed assisted living facility “fits the existing (zoning) regulations as a ‘home for the aged’ ”]).
*646 The Need For Assisted Living Facilities
A study, Assisted Living and Related Senior Housing,6 prepared by the Westchester County Department of Planning in June 1999 was made available to the Planning Board (the Assisted Living Study). The Assisted Living Study discussed the need for facilities to care for an increasing number of Westchester County residents over the age of 85 who are no longer able to care for themselves but are not in need of 24-hour intensive medical care.
New York State’s Assisted Living Program
The New York State Department of Health, along with the Westchester County Department of Social Services, developed legislation for the creation of the Assisted Living Program (ALP), to serve individuals who are medically stable, but who might otherwise be placed in a nursing home because they no longer have a suitable home or may require more supervision than can be economically provided through community-based home care. A work group composed of state agencies, the Legislature, institutional and community-based agencies and providers of care for the elderly and disabled was established, resulting in the enactment by the Legislature of New York’s current ALP as part of Laws of 1991 (ch 165). The ALP is required by statute to provide or arrange for resident services that, at minimum, include room, board, housekeeping, supervision, personal care, case management, activities, home health aid, nursing care, therapies and other home health services.[6]
[7]
Of Assisted Living Facilities, Nursing Homes And Sanitariums
Assisted living facilities are defined in the following sections of title 18 of the Official Compilation of Codes, Rules and Regulations of the State of New York: 18 NYCRR 505.35 (c) (1) and (d) (1); 18 NYCRR 485.2 (s); 18 NYCRR 494.2 (a); and 18 NYCRR 494.5 (a). According to title 18, an assisted living program means “an entity which is approved to operate pursuant to section 485.6 (n) of this part, and which is established and operated for the purpose of providing long-term residential care, room, board, housekeeping, personal care, supervision, and providing or arranging for home health services to five or more eligible adults unrelated to the operator.” (See 18 NYCRR *647 485.2 [s].) Pursuant to 18 NYCRR 505.23 (a) (3) (i) through (iii), home health services include nursing services, physical therapy, occupational therapy, or speech pathology and audiology services, and home health aide services.
A nursing home is defined in 10 NYCRR 415.2 (k) as follows:
“[n]ursing home, also referred to in this Part as a residential health care facility . . . shall mean a facility, institution, or portion thereof subject to article 28 of the New York State Public Health Law, providing therein, lodging for 24 or more consecutive hours to three or more nursing home residents who are not related to the operator by marriage or by blood within the third degree of consanguinity, who need regular nursing services or other professional services but who shall not need the services of a general hospital.”
A nursing home is also defined in article 28 of the New York State Public Health Law as
“a facility providing therein nursing care to sick, invalid, infirm, disabled or convalescent persons in addition to lodging and board or health-related service, or any combination of the foregoing, and in addition thereto, providing nursing care and health-related service, or either of them, to persons who are not occupants of the facility.” (Public Health Law § 2801 [2].)
Article 28 also defines a health-related service as “service in a facility or facilities which provide or offer lodging, board and physical care including, but not limited to, the recording of health information, dietary supervision and supervised hygienic services incident to such service.” (Public Health Law § 2801 [4] [b].)
A sanitarium (the Scarsdale Zoning Code uses the term sanatorium, the British spelling) is defined by the Oxford University Press as an establishment for the care of convalescent or chronically ill people. Webster’s New World Dictionary (2d ed) defines sanitarium as an institution for the care of invalids or convalescents.
The Public Hearings
On March 21, 2001, at a special meeting before the Planning Board, Realm made a presentation on its proposed ALE Dr. Audrey Weiner, from the Jewish Home and Hospital, the proposed operator of the ALF, Brad Weiner from the architectural firm of *648 Perkins Eastman, along with other witnesses, gave testimony-regarding the purpose of an ALE Dr. Weiner testified that, primarily, older, widowed women ages 82-83 live in ALFs. According to Dr. Weiner, these individuals cannot live by themselves any longer since they need help with at least two or more activities of daily living. They require health care aides and nursing staff to help them manage their needs on a daily basis. Many ALE residents have arthritis, Parkinson’s disease, congestive heart failure, diabetes, and poor vision, among other conditions. The Planning Board was informed that the proposed ALE will go beyond caring for people who are frail and will also serve a dementia population. They were told that an ALE was geared toward frail and elderly individuals not in need of 24-hour nursing care available in nursing homes. The Planning Board heard testimony that the population of elderly people in this category is growing. The building inspector pointed out that the distinction between frail and elderly who need 24-hour nursing care versus the frail and elderly who do not need 24-hour nursing care was a distinct change which was occurring in the nursing home community. This change was not addressed by the Scars-dale Zoning Code.[8]
The Planning Board’s Actions Were Not Arbitrary Or Capricious
A review of the entire record reveals that the Planning Board’s determinations and actions in approving the proposed ALE were not in violation of any lawful procedure or affected by an error of law or arbitrary and capricious or an abuse of discretion. The Planning Board based its determination on a review of all the evidence presented to it as to why the proposed ALE should be included as a special use under section 310-7 (F) (3) of the Scarsdale Zoning Code. A review of the May 22, 2002 findings statement reveals that the Planning Board fully reviewed and analyzed all the evidence presented to it during the nearly five-year review process. The Planning Board’s determination was lawful, logical, reasonable and rational. This court will therefore not disturb that determination.
The SEQRA Issue
Petitioners contend that the Planning Board’s actions “in adopting a findings statement and approving the project based on that findings statement were arbitrary, capricious, illegal, unsupported by the record, in violation of lawful procedure, un *649 reasonable and in excess of its jurisdiction, because the Planning Board failed to adequately address significant environmental impacts”[9] in violation of the State Environmental Quality Review Act.
The standard to be applied to an agency’s SEQRA determination has been stated as follows:
“It is well settled that judicial review of the SEQRA process is limited to whether ‘ “a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion” . . . [I]t is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively’. . . ‘[n]othing in the law requires an agency to reach a particular result on any issue, or permits the courts to second-guess the agency’s choice, which can be annulled only if arbitrary, capricious or unsupported by substantial evidence’.” (Matter of City of Rye v Korff, 249 AD2d 470, 471-472 [1998], lv denied 92 NY2d 808 [1998], quoting Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416-417 [1986].)
The issue before this court is whether the Planning Board “identified the relevant areas of environmental concern, took a ‘hard look’ at them, and made a ‘reasoned elaboration’ of the basis for its determination” (Matter of Jackson, 67 NY2d at 417).
“Where an agency fails to take the requisite hard look and make a reasoned elaboration, or its determination is affected by an error of law, or its decision was not rational, or is arbitrary and capricious or not supported by substantial evidence, the agency’s determination may be annulled . . . [Substantial evidence [is] ‘such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact’ ... or ‘ “the kind of evidence on which reasonable persons are accustomed to rely in serious affairs.” ’ ” (Matter of WEOK Broadcasting Corp. v Planning Bd. of Town of Lloyd, 79 NY2d 373, 383 [1992].)
*650 Pursuant to SEQRA’s rules as set forth in 6 NYCRR 617.7 (b) (1) through (4), the Planning Board, in reviewing a proposed action, must undertake the following steps:
“(1) consider the action as defined in sections 617.2(b) and 617.3(g) of this Part;
“(2) review the EAF [Environmental Assessment Form], the criteria contained in subdivision (c) of this section and any other supporting information to identify the relevant areas of environmental concern;
“(3) thoroughly analyze the identified relevant areas of environmental concern to determine if the action may have a significant adverse impact on the environment; and
“(4) set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any support documentation.”[10]
Thus, in making determinations, reviewing agencies, such as the Planning Board, must look at impacts which may be reasonably expected to result from the proposed action and compare them against an illustrative list of criteria provided in 6 NYCRR 617.7 (c). This list contains “indicators of significant adverse impacts on the environment” (6 NYCRR 617.7 [c] [1]), the most relevant one to this case being a substantial adverse change in existing traffic or noise levels pursuant to 6 NYCRR 617.7 (c) (1) (i).
A Careful SEQRA Review
Upon a thorough review of the voluminous record in this matter, it is clear that the Planning Board has met all of the requirements of SEQRA. During the nearly five-year review process, the Planning Board, as lead agency, held scoping sessions, adopted a scoping document, accepted a draft environmental impact statement and a final environmental impact statement, reviewed input from neighbors and the City of White Plains, reviewed submissions from Realm’s experts, and consulted with the Planning Board’s own experts before reaching its environmental findings. On May 22, 2002, the Planning Board adopted the SEQRA findings statement, finding in favor of the ALF project.
*651 What Traffic Problems?
Petitioners state that the Planning Board acknowledged that the ALF project would result in certain traffic problems within the City of White Plains, and then identified measures that could be undertaken to mitigate the problems. Petitioners argue that the Planning Board approved the proposal without requiring that the traffic impacts be mitigated and left it to others outside of the Planning Board’s control (i.e., the City of White Plains) to see to it that the requisite mitigation is carried out.
The court finds that petitioners do not raise valid objections to the Planning Board’s traffic determinations. Those determinations were based on a thorough review of the traffic impacts including input from the City of White Plains, Realm’s consultants, and advice from the Planning Board’s own traffic and planning consultants, Frederick P Clark Associates. The Village also engaged the services of Dvirka and Bartilucci, an engineering consulting firm. All consultants assisted in the preparation of the respondent Planning Board’s environmental findings.[11] Based on the review by the respondent Planning Board, any traffic impacts were found not to be significant. The Planning Board’s findings stated as follows:
“The proposed facility will not have a significant impact on future traffic conditions in the surrounding area. Traffic for the proposed facility will compose 1% or less of future traffic volumes at the three intersections evaluated. None of the intersections evaluated experienced a change in the Level-of-Service (LOS) with the proposed project. The applicant has committed to improve Saxon Woods Road to a consistent roadway width that meets the 1972-foot design standard. The applicant is willing to cover the costs associated with expanding the roadway to 1972-feet at the entrance point to this site, based on the additional volumes (1% of total daily volume) that the facility would add to the roadway. This 1972-foot roadway width conforms to context sensitive design principles because it takes the environment and the community into account while maintaining safety and mobility. In this particular case, context sensitive design means not incurring unnecessarily into wetlands west of Saxon *652 Wood. Road nor unnecessarily widening the road causing the loss of significant trees or rows of trees or stone walls. The one exception to this will be the necessity to prune some trees and clear some vegetation to improve sight distances from the entrance driveway. No other traffic related mitigation measures have been deemed necessary.”[12]
A Hospital Would Be Far More Intrusive
It is interesting to note that section 310-7 (F) (3) of the Scars-dale Zoning Code allows for a hospital as a permitted use. There is no question that traffic volume and activity would be greatly increased with emergency vehicle, police, visitor, and employee traffic if a hospital were constructed in this AA-1 residential district. Certainly, any minimal (less than 1%) traffic impact from this proposed ALF would be far less than what this neighborhood would have to endure were a “permitted” hospital to be built in the area.
Compliance With SEQRA
The Planning Board has met all of its SEQRA obligations in its nearly five-year review of the respondent Realm’s ALF application. Thus, there is no basis for the petitioners’ claim that the Planning Board violated SEQRA. The traffic impact of the ALF project will certainly be minimal since most of the residents will not have cars. The traffic studies demonstrated that this ALF would have no significant impact (no more than 1%) on future traffic nor cause a change in the level of service at any of the intersections or entrances. While no mitigation was found necessary for such a minor impact on traffic volumes Realm committed to the widening of Saxon Woods Road in White Plains. The Planning Board’s treatment of the road widening issue and recognition of Realm’s commitment was in keeping with the Planning Board’s SEQRA responsibilities.
The record clearly shows that the Planning Board identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis of its determination (see e.g., Matter of Save the Pine Bush v Planning Bd. of City of Albany, 298 AD2d 806, 807 [3d Dept 2002] [“Judicial analysis of an agency’s SEQRA determination is ‘limited to reviewing whether the determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion’ ”], quot *653 ing Matter of Gernatt Asphalt Prods. v Town of Sardina, 87 NY2d 668, 688 [1996]; Akpan v Koch, 75 NY2d 561, 570 [1990] [“(a)n agency’s compliance with its substantive SEQRA obligations is governed by a rule of reason and the extent to which particular environmental factors are to be considered varies in accordance with the circumstances and nature of particular proposals”]).
Conclusion
The Planning Board’s actions in adopting a findings statement and approving Realm’s ALF project were not a violation of lawful procedure, were not affected by an error of law, and were not arbitrary and capricious or an abuse of discretion. This court finds that the actions of the Planning Board in making its findings and approvals regarding both the special use issue and the SEQRA issue were not “arbitrary, capricious, illegal, unsupported by the record, in violation of lawful procedure, unreasonable and in excess of its jurisdiction” as alleged by petitioners in the notice of petition.
Accordingly, the notice of petition is denied in its entirety.

. The petitioners filed a “notice of petition” dated May 23, 2003. In response, respondent Village of Scarsdale Planning Board filed an “affidavit in opposition” and a “verified answer” on November 13, 2003, with accompanying “memorandum of law,” and respondent Realm, L.L.C. filed a “verified answer” dated November 13, 2003, with accompanying “memorandum of law.” In reply, the petitioners filed a “reply affirmation” dated January 16, 2004, with accompanying “memorandum of law.”

. In an earlier decision this court denied petitioner’s CPLR article 78 petition “seeking to overturn the Board of Appeals’ determination that their Appeal was untimely.” (See Matter of Jamil v Village of Scarsdale Bd. of Appeals, NYLJ, Oct. 9, 2003, at 20, col 3 [Sup Ct, Westchester County].)

. See notice of petition para 83.

. See Village of Scarsdale return, vol 1, exhibit B, at 1.

. See Village of Scarsdale return, vol 3, exhibit H, at 93 (emphasis added).

. See Village of Scarsdale return, vol 3, exhibit H, at 59-86, Assisted Living and Related Senior Housing, Westchester County Department of Planning (June 1999).

. See Assisted Living in New York: Preparing for the Future, Report to Governor and Legislature (May 1999).

. See Village of Scarsdale return, vol 3, exhibit G, at 19-23, 135-136.

. See notice of petition para 104.

. See 6 NYCRR 617.7 (b) (l)-(4).

. See affidavit of Village of Scarsdale Planner Elizabeth Marrinan, respondent Planning Board’s affidavit in opposition, exhibit B.

. See Village of Scarsdale return, vol 3, exhibit L, at 13-14.