*342
 
 OPINION OF THE COURT
 

 Graffeo, J.
 

 This case requires us to determine whether the New York City Council complied with the State Environmental Quality Review Act when it enacted Local Law No. 38 (1999) of, the City of New York, the City’s latest effort to address the abatement of lead paint in multiple dwelling units. Contemporaneously with its passage of Local Law 38, the City Council adopted a resolution declaring that the new law would have no significant adverse impact on the environment. We hold the City Council’s negative declaration does not set forth an adequate explanation clearly evincing the considerations underlying its determination that the new law would have no significant environmental effects. This failure to comply with statutory requirements renders Local Law 38 null and void.
 

 Background
 

 The dangers of exposure to lead-based paint, especially to young children, are well documented and pose a serious public health problem. “Lead is a poison that affects virtually every system in the body” and is particularly harmful to brain and nervous system development (Centers for Disease Control and Prevention Statement,
 
 Preventing Lead Poisoning in Young Children,
 
 at 7 [Oct. 1991]). Even low levels of blood lead have been linked to diminished intelligence, decreased stature or
 
 *343
 
 growth and loss of hearing acuity
 
 (see id.
 
 at 9). The numbers of New York City children with elevated blood lead levels remain alarmingly high. In 2000, over 6,200 children between six months and six years were newly identified as having blood lead levels of at least 10 micrograms per deciliter — the blood lead level that the Centers for Disease Control and Prevention has defined as “elevated” and associated with decreased performance on intelligence tests and impaired neurocognitive development and growth
 
 (see
 
 New York City Dept of Health and Mental Hygiene Lead Poisoning Prevention Program,
 
 Surveillance of Childhood Blood Levels in New York City,
 
 at 6-7, 19 [July 2002]). That figure translates to a City-wide elevated blood lead level rate of about 19 out of every 1,000 children tested in that age category
 
 (see id.
 
 at 23).
 

 Lead-contaminated surface dust is generated by deteriorating or peeling lead paint and by the presence of lead paint on friction and impact surfaces, such as doors and windows. Lead dust is the primary exposure pathway of childhood lead poisoning. Not surprisingly, young children are at a higher risk for lead exposure and its deleterious effects because of their normal hand-to-mouth activity and their developing neurological systems
 
 (see
 
 Report of Lead-Based Paint Hazard Reduction and Financing Task Force,
 
 Putting the Pieces Together: Controlling Lead Hazards in the Nation’s Housing,
 
 at 36;
 
 Preventing Lead Poisoning, supra
 
 at 18).
 

 As we noted in
 
 Juarez v Wavecrest Mgt. Team
 
 (88 NY2d 628, 640-641 [1996]), New York City first banned the use of lead-based paint for interior building surfaces in 1960
 
 (see
 
 NY City Health Code [24 RCNY] § 173.13). But remediation of existing lead paint was an enormous undertaking because 55% of the City’s housing units were built before 1950 and many of those units were situated in low-income neighborhoods
 
 (see Surveillance of Childhood Blood Levels, supra
 
 at 6 n 4). The challenge for the City was to identify the scope of the health risk while developing an administrative and enforcement system to oversee the abatement of lead paint.
 

 Due to the deteriorating condition of many buildings and the developing body of scientific and medical research on the effects of lead paint exposure, in 1982 the New York City Council directed owners of multiple dwelling units to remove or cover any lead-based paint in units inhabited by children six or younger. The adoption of Local Law No. 1 (1982) of the City of New York (Administrative Code of City of NY § 27-2013 [h]) represented the City’s comprehensive attempt to define owner
 
 *344
 
 obligations for the abatement of existing interior lead paint conditions. The statute created a presumption that peeling paint in any multiple dwelling erected prior to January 1, 1960 where a child six or younger resided constituted lead-based paint for abatement purposes. New York City Health Code regulations addressed to hazardous substances provided the exclusive safety standards governing abatement work practices under Local Law 1
 
 (see
 
 24 RCNY 173.14). Further, the City was required to establish enforcement procedures
 
 (see
 
 Administrative Code § 27-2013 [h] [5]).
 

 Beginning in 1985, a group of plaintiffs, including petitioner New York City Coalition to End Lead Poisoning (NYCCELP), commenced an action to compel the City to comply with its obligations under Local Law 1. The litigation progressed over many years, and multiple contempt orders were entered against the City and individual defendants arising from the failure to enact regulations in conformity with the statute and prior decisions
 
 (see New York City Coalition to End Lead Poisoning v Giuliani,
 
 173 Misc 2d 235 [NY County 1997],
 
 affd
 
 248 AD2d 120 [1st Dept 1998]). Notably, the courts interpreted Local Law 1 as requiring total abatement of lead-based paint, or a “lead-free” environment, regardless of the condition of the paint or its subsurface. In 1997, Supreme Court enjoined the City from implementing regulations the court deemed inadequate, and imposed a fine on the City “in an amount equal to the monthly rent of each of the named and intervening plaintiffs * * * to compensate the plaintiffs for their loss of adequate living conditions resulting from the lead paint infestation”
 
 (id.
 
 at 240).
 

 In October 1998, the City published proposed rules to implement Local Law 1 in response to court orders and conducted a public hearing. In December, the City Council Committee on Housing and Buildings (CHB) held an oversight hearing on the proposed rules and heard testimony from the Commissioner of the Department of Housing Preservation and Development and the Commissioner of Health, among others. These witnesses expressed grave health and economic concerns over the “lead-free” approach, warning that implementation of Local Law 1 as interpreted by the courts would exacerbate rather than diminish the incidences of childhood lead poisoning because of the risk that new hazards would be created by the disturbance of intact paint. In addition, representatives of low-income housing groups predicted that the total abatement policy would be prohibitively expensive and cause many owners to abandon
 
 *345
 
 properties because the rents would be insufficient to cover abatement costs. Consistent with these concerns, certain groups advocated a “lead-safe” program aimed at requiring abatement only of peeling or otherwise deteriorating paint to balance public health concerns and maintain affordable housing.
 

 Presented with input from multiple constituencies that the implementation of the statute’s lead-free requirement was not feasible or desirable, the City Council began to develop new legislation to replace Local Law l.
 
 [1]
 
 The City Council’s objective in crafting a new proposal was to achieve containment and repair of deteriorating lead paint but not wholesale elimination of all intact lead paint. Thus, the new legislation required abatement of lead-based paint hazards, which were defined as peeling lead-based paint on any surface or lead-based paint on a deteriorating subsurface in a dwelling unit in a multiple dwelling where a child under six years old resides (Administrative Code § 27-2056.1 [a] [2]).
 

 The draft legislation incorporated the more limited abatement duty and also lowered the age of children protected. When the draft legislation was released for public comment in May 1999, the City Council immediately began receiving criticism from numerous lead poisoning experts and other health professionals. They attacked the proposal for its failure to include lead dust in the definition of “lead-based paint hazard” and appropriate work-safety and clean-up protocols, such as clearance dust testing, to reduce the risks posed by the inhalation or consumption of lead dust.
 

 On June 21, 1999, the CHB held a public hearing on the proposed legislation. Again, experts and community representatives urged that the bill was seriously flawed, particularly with respect to lead dust and safety protocols. Witnesses expressed alarm over the creation of interim work-safety controls that owners could elect to use in place of the more stringent Health Code provisions that governed under Local Law 1. There were also objections to the time allowed building owners for compliance with abatement requirements. Moreover, several witnesses and committee members commented on the short period of time available for review and study of the proposal before
 
 *346
 
 the expiration of the stay deadline stipulated to in Supreme Court.
 

 The hearing reconvened on June 24 to consider an amended version of the bill. The amendments required dust wipe clearance testing in certain circumstances, reduced some, time periods for inspection and compliance procedures, and increased one of the civil penalties for noncompliance. Notwithstanding these changes, critics of the new legislation remained dissatisfied with the absence of lead dust from the hazard definition, the safety protocols and the length of time provided for hazard correction. Ultimately, the CHB voted seven to two to adopt a resolution dated June 24 identifying the City Council as lead agency for environmental review purposes. Most importantly, the resolution contained legislative approval of a negative declaration for the proposed legislation, which determined that the law would not have a significant impact on the environment. By the same vote, the CHB reported the bill out of committee to the full City Council.
 

 At a meeting on June 30, the City Council members debated the legislation, and four amendments weré proposed and rejected. Opponents voiced familiar objections, and supporters emphasized the bill’s merits, particularly in light of the challenges presented by the existing abatement statute. The City Council passed the legislation and the resolution adopting the negative declaration by a vote of 36 to 15. After a public hearing, Mayor Rudolph Giuliani signed the legislation — Local Law 38 of 1999 — into law, effective November 12, 1999.
 

 Current Proceeding
 

 Petitioners — NYCCELP and other nonprofit entities, as well as several individual tenants — commenced this proceeding seeking to nullify Local Law 38 and direct the City to prepare an environmental impact statement (EIS) on the proposed legislation because the City Council failed to comply with the State Environmental Quality Review Act (SEQRA).
 
 [2]
 
 Petitioners asserted that the negative declaration adopted by the City Council failed to identify and analyze the numerous potential adverse effects of replacing Local Law 1 with Local Law 38. Respondents answered that the City Council’s enactment of
 
 *347
 
 Local Law 38 complied with SEQRA and that the negative declaration was facially valid.
 
 [3]
 
 In addition, respondents argued that the City Council’s determination that the new law would have no significant adverse impacts was rational and rooted in the legislative policy choice to attain environmental benefits through adoption of a lead-safe approach to the problem.
 

 Supreme Court granted the petition and invalidated the negative declaration and Local Law 38 on the ground that the legislative process did not satisfy environmental review requirements. The Appellate Division reversed and dismissed the petition, finding the negative declaration and Local Law 38 valid. Upon its review of the entire record, the Appellate Division concluded that the City Council’s environmental review process reflected thorough consideration of relevant areas of concern. This Court granted petitioners leave to appeal, and we now reverse.
 

 Analysis
 

 The Legislature adopted SEQRA with the express intent that “the protection and enhancement of the environment, human and community resources shall be given appropriate weight with social and economic considerations in public policy” and that SEQRA’s policies, statutes and regulations should be implemented “to the fullest extent possible” (ECL 8-0103 [7], [6]). To that end, the Legislature created “an elaborate procedural framework” governing the evaluation of the environmental ramifications of a project or action
 
 (Matter of King v Saratoga County Bd. of Supervisors,
 
 89 NY2d 341, 347 [1996]). In assessing the significance of a proposed action under SEQRA, the lead agency must “thoroughly analyze the identified relevant areas of environmental concern to determine if the action may have a significant adverse impact on the environment; and * * * set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any supporting documentation” (6 NYCRR 617.7 [b] [3], [4]). Where the lead agency concludes either that “there will be no adverse environmental impacts [from the action] or that the identified adverse environmental impacts will not be significant,” the agency may issue a negative declaration thus obviating the EIS requirement (6 NYCRR 617.7 [a] [2]).
 

 
 *348
 
 Judicial review of a lead agency’s negative declaration is restricted to “whether the agency identified the relevant areas of environmental concern, took a ‘hard look’ at them, and made a ‘reasoned elaboration’ of the basis for its determination”
 
 (Matter of Jackson v New York State Urban Dev. Corp.,
 
 67 NY2d 400, 417 [1986];
 
 see Matter of Merson v McNally,
 
 90 NY2d 742, 751 [1997]). As we observed in
 
 Jackson,
 
 SEQRA guarantees that agency decisionmakers “will identify and focus attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices” (67 NY2d at 414-415).
 

 SEQRA’s policy of injecting environmental considerations into governmental decisionmaking
 
 (see Matter of Coca-Cola Bottling Co. v Board of Estimate of City of N.Y.,
 
 72 NY2d 674, 679 [1988]) is “effectuated, in part, through strict compliance with the review procedures outlined in the environmental laws and regulations”
 
 (Matter of Merson,
 
 90 NY2d at 750). Strict compliance with SEQRA is not
 

 “a meaningless hurdle. Rather, the requirement of strict compliance and attendant spectre of de novo environmental review insure that agencies will err on the side of meticulous care in their environmental review. Anything less than strict compliance, moreover, offers an incentive to cut corners and then cure defects only after protracted litigation, all at the ultimate expense of the environment”
 
 (Matter of King,
 
 89 NY2d at 348;
 
 see Matter of E.F.S. Ventures Corp. v Foster,
 
 71 NY2d 359, 371 [1988]).
 

 Accordingly, where a lead agency has failed to comply with SEQRA’s mandates, the negative declaration must be nullified
 
 (see e.g. Chinese Staff & Workers Assn. v City of New York,
 
 68 NY2d 359, 368-369 [1986]).
 

 Here, petitioners assert that the potential adverse environmental effects were not sufficiently addressed in the negative declaration. Emphasizing that any removal of lead paint— regardless of the paint’s condition — constitutes an inherently hazardous activity, petitioners contend that the negative declaration and its supporting documents impermissibly failed to identify or analyze areas of environmental concern, such as the exclusion of lead dust from the definition of a lead-based paint
 
 *349
 
 hazard and the elimination of six-year-old children from the protections of the new law. Petitioners urge that the City Council’s environmental review process falls short of the analysis required by SEQRA and renders the negative declaration, and consequently Local Law 38, invalid.
 

 Respondents counter that the legislative process — the hearings, written submissions and the record of the City Council’s deliberations — establishes “exhaustive consideration of the claimed advantages and disadvantages of all of the debated provisions of LL 38.” They contend that the City Council was thoroughly informed and properly considered every issue identified by petitioners.
 

 We conclude that the City Council did not fully comply with SEQRA’s stringent requirements. The “Notice of Negative Declaration” for Local Law 38 reports: “[t]he City Council has completed its review * * * and has determined the proposed action will have no significant adverse impact on the quality of the environment.” In support of this conclusion, the narrative attachment to the negative declaration addresses “Hazardous Materials” as a subsection of the “Environmental Assessment.” The subsection consists of two paragraphs summarizing the purposes of the law’s interim controls for the repair of lead-based paint hazards. This provision, along with general descriptions of the legislation and its socioeconomic impacts, comprises the entire explanation provided in the negative declaration supporting the determination that Local Law 38 would have no significant adverse environmental effects. This does not provide the “reasoned elaboration” mandated by SEQRA.
 

 The CHB and the City Council received extensive input from some of the nation’s preeminent lead poisoning experts, many of whom explicitly addressed the proposed law’s exclusion of lead dust from the hazard definition. But nowhere in the negative declaration or any of its supporting documentation does the City Council identify lead dust as a relevant area of concern or explain its determination to omit this substance from the definition. Respondents do not dispute that lead dust is a potentially significant health hazard related to remediation efforts and do not claim the negative declaration contains a commentary on this issue. Instead, respondents rely on the hearing record as evidence of the City Council’s consideration of the environmental concerns relating to lead dust.
 

 In an effort to explain the exclusion of dwelling units occupied by six year olds from the definitional provisions,
 
 *350
 
 respondents merely cite current federal and state law provisions that define the protected class as including children under six
 
 (see
 
 42 USC §4852 [d] [1]; 15 USC §2681 [16] [A]; 10 NYCRR 67-1.2 [a] [1]). Similar to the lead dust issue, this legislative choice is neither identified as a possible adverse impact of the new law nor discussed in the negative declaration, despite the considerable number of children affected by this change
 
 (see
 
 6 NYCRR 617.7 [c] [3] [vii]).
 

 SEQRA requires more. As we stated in
 
 Matter of King,
 
 “[t]he mandate that agencies implement SEQRA’s procedural mechanisms to the ‘fullest extent possible’ reflects the Legislature’s view that the substance of SEQRA cannot be achieved without its procedure, and that departures from SEQRA’s procedural mechanisms thwart the purposes of the statute” (89 NY2d at 347). Strict compliance with SEQRA guarantees that environmental concerns are confronted and resolved prior to agency action and insulates rational agency determinations from judicial second-guessing
 
 (see Matter of Jackson v New York State Urban Dev. Corp.,
 
 67 NY2d at 417).
 

 While the record of this legislative process reveals concerned lawmakers struggling with the undoubtedly weighty social, economic and environmental consequences of their decisions, the negative declaration offers little qualitative analysis of the myriad factors inherent in the ultimate passage of Local Law 38 and no assurances that the environmental and public health concerns presented took “their proper place alongside economic interests”
 
 (Matter of King,
 
 89 NY2d at 347). The City Council may have had sufficient information to render a proper determination that the new law would not pose any significant adverse environmental impacts, thereby not requiring an EIS. The negative declaration, however, fails to provide an adequate basis upon which a reviewing court can ascertain this because the document does not contain a reasoned elaboration explaining why the City Council reached this conclusion. Among the options available to the City to remedy these deficiencies, the City Council can supplement or reinitiate the requisite procedural steps for the proper adoption of abatement legislation.
 

 The parties recognize that, by operation of law, our invalidation of Local Law 38 revives Local Law 1. Significantly, petitioners stated in their reply brief and reiterated at oral argument that they “would not object were this Court to find it necessary to include, in any order nullifying LL 38 and the negative declaration, a provision staying enforcement of the
 
 *351
 
 specific regulatory provision arising from the NYCCELP litigation * * * that mandates the City to inspect for and order the abatement of intact lead paint.” We note for clarity that, because the City Council replaced Local Law 1 with Local Law 38, the regulatory provision that petitioners reference was never formally adopted. Nevertheless, petitioners’ concession acknowledges that Local Law 1, interpreted as requiring the total abatement of intact lead paint, is not a viable or realistic approach to protecting the City’s population, particularly its young children, from lead exposure.
 

 Although the enforcement of Local Law l’s implementing regulations is not an issue before us on the present appeal, we commend the parties for their efforts to craft a workable solution that strives to reconcile the important social and economic consequences emanating from the City’s attempts to address this public health problem. In holding Local Law 38 null and void and remitting to Supreme Court, we expect that the parties will continue to work cooperatively to ensure that the resurrection of Local Law 1 does not further imperil New York City’s children.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion.
 

 Chief Judge Kaye and Judges Smith, Cipabick, Rosenblatt and Read concur.
 

 Order reversed, etc.
 

 [1]
 

 . In recognition of the City Council’s ongoing review of the proposed rules, in January 1999, the parties entered the first of a series of temporary stays of enforcement of Supreme Court’s orders in the 1985 litigation. Ultimately, the parties stipulated to an extension of the stay until June 30, 1999.
 

 [2]
 

 . Petitioners also framed their claims as violations of the City Environmental Quality Review (CEQR) laws
 
 (see
 
 43 RCNY 6-01
 
 et seq.;
 
 62 RCNY 5-01
 
 et seq.).
 
 As relevant here, the challenges made under CEQR are indistinguishable from the state law claims.
 

 [3]
 

 . Notably, respondents did not contend that SEQRA was inapplicable to the legislative action of the City Council. In fact, by designating itself lead agency and approving the negative declaration, the City Council demonstrated its view that SEQRA did apply to the enactment of Local Law 38.