[896 NYS2d 588]

In the Matter of CHINESE STAFF AND WORKERS ASSOCIATION et al., Petitioners, v MICHAEL BLOOMBERG, Mayor of the City of New York, et al., Respondents.

Supreme Court, New York County, December 24, 2009

### APPEARANCES OF COUNSEL

*Asian American Legal Defense and Education Fund*, New York City (*Stanley Mark* of counsel), for petitioners. *Michael A. Cardozo, Corporation Counsel*, New York City (*Carrie Noteboom* of counsel), for respondents.

### OPINION OF THE COURT

WALTER B. TOLUB, J.

This application involves a recently rezoned area of Manhattan which sits within part of Manhattan's Community District 3 (CD3). The 111-block area represents the third largest rezoning in New York City (the City) to take place since 1961, and stretches from Bowery and Third Avenue on the west, to Avenue D on the east, and from East 13th Street on the north, to East Houston, Delancey and Grand Streets on the south (the rezoning area). The rezoning area is largely made up of two long-standing residential communities comprised mostly of nineteenth century tenements with supporting institutional uses. Both areas are historically significant, and readily recognized by New Yorkers and non-New Yorkers alike.[1]

By this CPLR article 78 special proceeding, petitioners seek an order annulling the final environmental impact statement (FEIS) dated September 26, 2008 prepared by respondent, the New York City Department of City Planning (DCP), on the grounds that the DCP failed to both take a hard look at the socioeconomic impact of the rezoning and account for the cumulative impact of the rezoning with other pending developments. Petitioners additionally seek the issuance of an order directing respondent DCP or any other lead agency to prepare a new environmental impact statement that conforms with the requirements of the New York State Environmental Quality Review Act (SEQRA) (ECL 8-0101 *et seq.*) and the City Environmental Quality Review (CEQR) (62 RCNY 5-01 *et seq.*).

Background

Petitioners are comprised of entities, organizations, and individuals who live and work within the rezoning area, all of whom will ultimately be affected by the rezoning. Petitioner Chinese Staff and Workers Association (CSWA) is a membership

---

**1.** The East Village is oft recognized from contemporary portrayals in television and film and its proximity to multiple institutions of higher education. The Lower East Side is known for having been the most famous immigrant neighborhood in the United States at the turn of the twentieth century.

organization for Chinese workers located in Chinatown. CSWA organizes Chinese workers to fight for their legal and human rights in both the workplace and the broader community. Petitioner National Mobilization Against Sweatshops is a membership organization located in the Lower East Side which is dedicated to ending sweatshop conditions. Petitioner Chinese Restaurant Alliance is a membership organization located in Chatham Square, advocating on behalf of the rights of restaurant workers and owners.

Petitioners Zhi Liang Chen and Susan Howard are rent-stabilized tenants who respectively reside on Ludlow and Norfolk Streets, both of which are within the rezoned area. Petitioner Yolanda Donato Hernandez is a resident at the Jacob Riis public housing project on Avenue D, an area which is within the one-fourth-mile secondary study area of the rezoning.[2] Petitioner Norma Ramirez is a resident at the Seward Park Cooperative on Grand Street, also located within the one-fourth-mile secondary study area of the rezoning. Petitioner Steven Wong is the director of the Chinese Restaurant Alliance, and both resides and works in Chatham Square, an area which is located just outside the one-fourth-mile secondary study area.

Petitioners claim that contrary to respondents' analyses, the rezoning accelerates and concentrates luxury development in low-income communities of color, thereby creating a disproportionate adverse impact in these neighborhoods. Petitioners further claim that the DCP's FEIS is deficient because it failed to consider five elements: (1) the disproportionate impact of the rezoning on lower-income communities of color; (2) significant socioeconomic differences of the neighborhoods in the rezoning area; (3) indirect displacement of low-income populations of color both inside and outside of the proposed rezoning area; (4) displacement of businesses; and (5) the availability of affordable housing.

History of the Rezoning Area

The building types and scales in the rezoning area are predominately low- and mid-rise multiple dwelling apartments and row houses built to the street line. The buildings include nineteenth and early twentieth century tenement buildings ranging from four to seven stories in height (*see* exhibit 1, City

---

2. The one-fourth-mile "secondary study area" will be discussed infra.

Planning Commission [CPC][3] Report C 080397A ZMM [Oct. 7, 2008]; affidavit of Edith Hsu-Chen[4] ¶ 9).

Since 1961, the majority of the rezoning area has been subject to a zoning resolution which allowed for development out of scale with the prevailing low- and mid-rise neighborhood character due to a lack of street wall[5] and overall building height limits on development. The result, as evidenced by very recent construction, has been the development of tall, slender buildings surrounded by open space in parts of this area of New York City.

Genesis of the Rezoning Plan

Recognizing the very active real estate market which has developed in the rezoning area over the last 10 to 15 years,[6] and concerned with a strong demand for housing,[7] a need to promote the development of affordable housing in the area,[8] and the desire to preserve the unique character of neighborhoods (respondent's mem of law at 4-5; CPC Report C 080397A ZMM at 31; FEIS at 1-3), the City began the process of rezoning this expansive area. It is respondents' position that the rezoning is designed to preserve the low- and mid-rise character of these East Village and Lower East Side neighborhoods, and to ensure that new development is channeled to specific locations that are better suited for such development, providing opportunities for new housing, and to encourage the development of affordable housing.

---

3. The City Planning Commission is designated as the lead agency for the purposes of undertaking the environmental review for the rezoning.

4. Edith Hsu-Chen is the director of DCP's Manhattan office.

5. A "street wall" is a wall or portion of a wall of a building which faces a street (Zoning Handbook, at 112; respondents' exhibit 12).

6. Between 1990 and 2000 this area experienced a 7.6% increase in housing units, a higher growth rate than that experienced in the Borough of Manhattan (1.7%) and the City as a whole (7.0%). Median contract rents increased 35.7% (from $689 to $934) (FEIS at 3-7; affidavit of Edith Hsu-Chen ¶ 17).

7. It is no secret that there is presently a city-wide rental vacancy rate of less than 3% and the City continues to have enough of a supply shortage to warrant a "housing emergency" (affidavit of Edith Hsu-Chen ¶ 16).

8. The proposed zoning is the product of a three-year process. According to the papers, DCP's proposal was the result of advocacy of CD3 and the East Village Community Coalition, along with support of elective representatives of City Council Districts 1 and 2 (exhibit 1, CPC Report C 080397A ZMM at 31). Other civic groups joined in advocating for the rezoning, and the DCP consulted with the New York City Department of Housing Preservation and Development (HPD) before finalizing the rezoning proposal (id.).

On May 2, 2008, the DCP, the agency responsible for advising and assisting the Mayor, Borough Presidents, and the City Council with the physical planning and public improvement aspects of all matters related to the City, proposed zoning map and text amendments which collectively are known as the East Village/Lower East Side rezoning (the rezoning) (*see* exhibit 1, CPC Report C 080397A ZMM; affidavit of Edith Hsu-Chen ¶¶ 8-9).

To better understand the respondents' rezoning plan requires a more comprehensive, but brief, overview of the 1961 zoning area, and a short introduction to the concept of contextual zoning as well as a brief overview of the City's Inclusionary Housing Program.[9]

Prior to the rezoning, the vast majority of the 111-block area affected was zoned as R7-2, which allows a maximum floor ratio (FAR)[10] of 3.44 for residential uses and 6.5 for community facilities (FEIS at 1-3, figure 1-2; affidavit of Edith Hsu-Chen ¶¶ 14-16). The southwestern portion of the rezoning area was zoned as C6-1, which allows the same FAR for residential and community facilities as R7-2 areas, but also allows for commercial development at a maximum 6 FAR (*id.*). As previously mentioned, both of these zoning districts lack limitations on street wall height and overall building height.

The rezoning uses contextual zoning districts to guide development to an appropriate scale and form that is more reflective of the existing buildings within a neighborhood (respondent's mem of law at 6; FEIS at 1-3). Areas which had been zoned as R7-2 and C6-1 have been rezoned under the new plan to the following zoning classifications: R7A, R7B, R8A, R8B, C4-4A, C6-2A and C6-3A (FEIS at 1-4; affidavit of Edith Hsu-Chen ¶ 29). The locations of these zoning areas are scattered throughout the 111-block area.

Respondents claim that the benefits of contextual zoning districts include more effective regulation of the height and

---

**9.** A more comprehensive explanation of city zoning rules, regulations, and methodology for calculation is found within the papers submitted by the parties in this proceeding. The court is only including the most relevant of the information for both simplicity and brevity.

**10.** FAR is a means of determining a "total zoning floor" area permitted to be built on a zoning lot. Each zoning district has a FAR control, which, when multiplied by the lot area of the zoning lot, generates the maximum amount of floor area allowable in a building on the zoning lot. The higher the FAR, the greater the bulk allowed (Zoning Handbook, at 105-106; affidavit of Edith Hsu-Chen ¶ 14, n 3).

bulk of new buildings, their setback from the street line, and their width along the street frontage. The application of the new zoning regulations would therefore result in the development of buildings with similar density of development in terms of FAR, but which are more consistent with existing neighborhood character (FEIS at 1-14, table 1-5). The new zoning rules would also preserve block-fronts along narrow streets (defined as less than 75 feet in width), while directing future growth to areas primarily fronting wide streets (defined as being 75 feet wide or greater) (respondent's mem of law at 6).

Respondents additionally maintain that the contextual zoning districts would ultimately result in a greater number of projected housing units (FEIS at 1-14, table 1-5)[11] in part, because the rezoning calls for the application of the City's Inclusionary Housing Program (IHP).[12] IHP is a voluntary and pioneering program created by the City and administered by HPD to encourage the development of affordable housing on privately held land (exhibit 1, CPC Report C 080397A ZMM at 37-38). Participation requires that the housing be affordable to households earning no more than 80% of the area median income (AMI), and in many cases, targets families with incomes below 60% of the AMI, as a result of additional subsidy programs and zoning incentives (FEIS at 26-27, respondent's mem of law at 8-9). Rezoned districts promoting the development of IHP housing include the R7A districts on Second Avenue, First Avenue, Avenue A and Avenue C; the R8A districts on East Houston Street, Delancey Street, Avenue D, Second Avenue and Pitt Street; and the R9A districts on Chrystie Street (CPC Report C 080397A ZMM).

In opposition, petitioners argue that concentrated upzoning, i.e., the expansion of FAR in specific areas, would increase luxury development opportunities in areas where 60% to 90% of the population are people of color, and are more vulnerable to involuntary displacement. Petitioners further argue that while the increase of FAR in the rezoned area ranges from 16% to 34%, DCP's rezoning scheme increases the FAR by 109% along Delancey Street, East Houston Street and Avenue D, and by

**11.** Using a projected development of 10 years into the future, respondents maintain that the rezoning would create 3,917 housing units. Development without the rezoning, as calculated by respondents' FEIS, would create only 2,534 housing units.

**12.** This is a program in addition to the recently modified 421-a tax abatements and the City's R10 Program which has encouraged the creation of low-income housing since 1987.

147% along Chrystie Street. On the whole, petitioners claim that the respondent's FEIS is severely flawed because it fails to address and disclose all of the potential impacts of the rezoning in its socioeconomic analysis.

## SEQRA, CEQR and ULURP

The very nature of a rezoning application triggers a review under the City's Uniform Land Use Review Procedure (ULURP) (NY City Charter § 197-c; 62 RCNY 2-01 *et seq.*), followed by environmental reviews of the proposed action under CEQR and SEQRA.

SEQRA has long been recognized and identified as a legislative attempt to ensure that state and local agencies consider both the immediate and long-term environmental effects of their proposed actions (*Matter of Spitzer v Farrell*, 100 NY2d 186, 190 [2003]; *see also Akpan v Koch*, 75 NY2d 561, 569 [1990]; *Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y.*, 72 NY2d 674, 679 [1988]; *Chinese Staff & Workers Assn. v City of New York*, 68 NY2d 359, 361 [1986]). CEQR, as delineated in 62 RCNY 5-01 *et seq.*, is the vehicle by which SEQRA is implemented in the City of New York, and has an elaborate procedural framework governing how city agencies are to evaluate the environmental ramifications of their decisions to fund, approve, or directly undertake a discretionary project or action (*Matter of New York City Coalition to End Lead Poisoning v Vallone*, 100 NY2d 337, 347 [2003]; *Matter of 27th St. Block Assn. v Dormitory Auth. of State of N.Y.*, 302 AD2d 155, 157 [1st Dept 2002]).[13]

Proposed projects which may have a significant effect on the surrounding environment must be reviewed under SEQRA (ECL 8-0109 [2]; *Akpan v Koch*, 75 NY2d 561, 569 [1990]). Potential environmental concerns must be assessed and further evaluated in order to determine whether or not a significant environmental impact may result (*Matter of New York City Coalition to End Lead Poisoning v Vallone*, 100 NY2d 337 [2003]). The requirements of SEQRA are substantive, and the lead agency undertaking the review, which here is the CPC, is required to "act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects" (ECL 8-0109 [1]; *see also Akpan*, 75 NY2d 561, 570 [1990]; *Matter of*

---

13.  CEQR does not require review of a proposed action when it would not otherwise be required by SEQRA (*Matter of Markowitz v Bloomberg*, 2 Misc 3d 558, 567 [Sup Ct, Kings County 2003]).

*Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 417-418 [1986]). Compliance with SEQRA's obligations, however, is governed by a rule of reason, as the extent to which particular environmental factors are to be considered varies in accordance with each proposal (*Akpan* at 570).

The result is that the lead agency must conduct a thorough analysis in assessing the significance of a proposed action and whether that action may have a significant adverse impact on the environment (*Matter of New York City Coalition to End Lead Poisoning v Vallone*, 100 NY2d 337 [2003]; 6 NYCRR 617.7 [b] [3]). Once complete, the lead agency must then present a written statement containing its reasoned elaboration with references to any applicable supporting documentation (6 NYCRR 617.7 [b] [4]).[14] The initial environmental analysis is then most often followed by an environmental impact statement (EIS), and then, where necessary, as it was in the instant application, an FEIS.[15]

Judicial Authority

"A court's authority to examine a SEQRA review conducted by an entity that was required to do so is limited to reviewing

**14.** This is heralded as the initial environmental analysis by the lead agency. The initial analysis includes a study of "the same areas of environmental impacts as would be contained in an EIS, including both the short-term and long-term effects as well as the primary and secondary effects of an action on the environment" (*Chinese Staff & Workers Assn.*, 68 NY2d 359, 364 [1986] [citations omitted]).

**15.** The rezoning was only approved after a three-year process which began in August of 2005 with a DCP meeting with community members. Meetings and information sessions were held in 2005 and 2006 (respondent's mem of law at 10). A positive declaration and a draft scope of work for the draft environmental impact statement (DEIS) were issued on May 25, 2007 (respondents' exhibits 6, 7). In June of 2007, the public was invited to comment on the methodologies to be used in preparing the EIS (FEIS at 27-1—27-45). A draft EIS was completed in May of 2008 and was subject to public hearings and modifications. CD3 approved the draft EIS, with conditions expressed, on May 27, 2008 (CPC Report C 080397A ZMM at 20). In June of 2008, DCP filed a modified ULURP application which included an expanded IHP, extending the coverage to Chrystie Street. The modified proposal was referred out to CD3 and the Borough President on July 7, 2008, and adopted by the CPC (CPC Report C 080397A ZMM at 20). Again, with conditions expressed, the Manhattan Borough President recommended approval of the rezoning on August 11, 2008. The CPC then held a joint public hearing on the DEIS and the applications for the rezoning on August 13, 2008, at which 47 speakers testified in favor of the rezoning, and 24 speakers, including petitioner CSWA, testified in opposition (affidavit of Edith Hsu-Chen ¶ 43). The FEIS, consisting of 27 chapters, was completed on September 26, 2008 (*see* respondents' exhibits), and was unanimously approved by the CPC on October 7, 2008, and by the City Council on November 19, 2008.

whether the determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (*Matter of Gernatt Asphalt Prods. v Town of Sardinia*, 87 NY2d 668, 688 [1996]). Thus, the singular question before this court is "whether the agency identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination" (*Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 417 [1986]; *Matter of Gernatt Asphalt Prods. v Town of Sardinia*, 87 NY2d 668, 688 [1996]; *Matter of New York City Coalition to End Lead Poisoning v Vallone*, 100 NY2d 337, 348). The court's role is not to weigh the desirability of the proposed action, choose among alternatives, resolve disagreements among experts, or substitute its judgment for that of the reviewing agency (*Matter of Fisher v Giuliani*, 280 AD2d 13 [1st Dept 2001]; *Matter of Neville v Koch*, 79 NY2d 416 [1992]).

Petitioners' argument in support of invalidating the FEIS is largely based upon the claim that respondents failed to consider all of the socioeconomic impacts of the rezoning and, in particular, the impact the rezoning would have on individuals of varied ethnic and racial groups with respect to residential and business displacement. Petitioners' arguments are supported solely by a Hunter College study conducted on the rezoning (Tom Angotti and Kate Ervin, *Analysis of Draft Environmental Impact Statement, East Village/Lower East Side Rezoning* [Hunter College Center for Community Planning and Development, Aug. 2008] [the Hunter College study]), which heavily criticizes the FEIS for its claimed failure to analyze a multitude of areas, including the disparate socioeconomic effects of the rezoning on tenants in public housing and rent-stabilized housing (petitioners' exhibit A, affidavit of Dr. Tom Angotti). The study also claims that the FEIS fails to analyze a reasonable worst case development scenario, as required by CEQR (*id.*).

The problem with this argument, setting aside the volatility of the current economic climate which is indiscriminately decimating businesses and displacing residents in this city, is that respondent's assessment of socioeconomic impacts in the FEIS followed the two-step approach set forth in the CEQR Technical Manual, and is supported with a "reasoned elaboration" of the basis for its determinations.

Socioeconomic analyses within CEQR and SEQRA are guided by the CEQR Technical Manual, which sets forth a two-step ap-

proach to analyzing potential impacts. First, a preliminary assessment is conducted to learn about the effects of the proposed action in relation to existing conditions and future trends, in order to rule out the possibility of significant adverse impacts, or to determine if a more detailed analysis of the issue is required (affidavit of Eric Kober[16] ¶ 26). Then, if the preliminary assessment reveals the action's effects could be significant in the context of existing conditions and future trends, a detailed analysis is conducted (*id.*; *see generally* CEQR Technical Manual, at 3B-2—3B-4).

The study is always comprised of a "primary" and a "secondary" area. The primary area encompasses the study site (affidavit of Eric Kober ¶¶ 28-30). The secondary area, which does not carry a mandatory radius, is the adjacent area likely to be affected by the action (*id.*). With respect to the rezoning, the primary area was the entire 111-block section of Manhattan. The secondary area extended one-fourth mile from the rezoning area. Contrary to petitioners' assertions, respondents chose the one-fourth-mile radius because the rezoning does not seek to transform the East Village and the Lower East Side into a new neighborhood. To the contrary, as explained by respondents, any new development is scattered and limited relative to what already exists. (Affidavit of Eric Kober ¶¶ 23-34.)

Moreover, contrary to the claims advanced by petitioners, the study provides "reasoned elaboration" of the basis for respondent's conclusion concerning its "Reasonable Worst Case Development Scenario"[17] and projected development of affordable housing units calculations. Again, the figures used to calculate these numbers were based on CEQR Technical Manual methodologies and using known factors including current development proposals, current market demands, past development trends and objective criteria developed by DCP to identify sites where development can be reasonably expected to occur (CEQR Technical Manual, at 2-6—2-7, 3B-3—3B-5; FEIS at 1-9—1-10, 3-2—3-8; affidavit of Eric Kober).

---

**16.** Eric Kober is the Director of the Housing, Economic and Infrastructure Planning Division at the New York City Department of City Planning.

**17.** The Reasonable Worst Case Development Scenario (RWCDS) is the term used to describe projections of future development both under a particular action and in the absence of that action. RWCDS calculations are used when a proposed action is not associated with specific development changes. Estimates, which must be conservative, are based on a combination of methodologies established by the CEQR Technical Manual and reasonable build-out assumptions for a given area (affidavit of Eric Kober ¶¶ 10-22).

Petitioners have advanced very valid concerns in their application and this court is very sympathetic and aware of the need for affordable housing in New York City, the concerns of overdevelopment and the often economically driven shifting of demographics within neighborhoods. The court is equally cognizant of the need for urban planning, which is not only utilized to preserve neighborhoods, but is also utilized to ensure that city resources are used to the best possible advantage for all of its citizens, businesses, and visitors who are here now, and who will arrive here in the future.

However, having reviewed the submissions reflecting the progression of the rezoning plan through its three-year-long review process, it is this court's determination that petitioners' argument is based on their disagreement with the methodologies and conclusions reached by DCP, and not based on any valid evidence which would warrant invalidation of respondents' reasoned analysis (*Akpan v Koch*, 75 NY2d 561 [1990]; *Real Estate Bd. of N.Y. v City of New York*, 157 AD2d 361, 363-364 [1st Dept 1990]). There is simply no evidence presented to the court which supports the claim that respondents failed to take a ''hard look'' or inadequately addressed the potential cumulative environmental impacts of this monumental rezoning project (*see Matter of LaDelfa v Village of Mt. Morris*, 213 AD2d 1024 [4th Dept 1995]; *Matter of Tehan v Scrivani*, 97 AD2d 769 [2d Dept 1983]).

Accordingly, it is adjudged that the petition is denied and the proceeding is dismissed as to all respondents.