S.T. v 1727-29 LLC (2020 NY Slip Op 03630)





S.T. v 1727-29 LLC


2020 NY Slip Op 03630


Decided on June 25, 2020


Appellate Division, First Department


Moulton, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 25, 2020
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta, P.J.
Barbara R. Kapnick
Peter H. Moulton
Lizbeth González, JJ.


350020/08 11041 

[*1]S.T., an Infant Under the Age of Fourteen Years, etc., et al., Plaintiffs-Appellants,
v
1727-29 LLC, et al., Defendants-Respondents.



Plaintiffs appeal from an order of the Supreme Court, Bronx County (Paul L. Albert, J.), entered on or about March 8, 2019, which denied plaintiffs' motion for partial summary judgment.




Law Office of Neil R. Finkston, Great Neck (Neil R. Finkston of counsel), for appellants.
Landman Corsi Ballaine & Ford P.C., New York (Shayna A. Bryan and Rebecca W. Embry of counsel), for respondents.



MOULTON, J.


Plaintiff mother brings this appeal on behalf of her child (S.T.) and herself in this lead paint poisoning action under Local Law No. 1 (1982) of City of New York (Local Law 1). Supreme Court denied plaintiffs' motion for partial summary judgment on liability against the owners, landlord, and property manager of the building (collectively defendants) finding that defendants raised an issue of fact as to whether they took reasonable measures to address the hazardous lead-based paint condition in the apartment. However, Supreme Court granted plaintiffs' motion to the extent that it found that defendants were on notice of the alleged lead-based paint condition. Plaintiffs appealed.
We find that defendants failed to raise an issue of fact that the lead paint hazard existed despite their diligent and reasonable efforts to prevent it. Nevertheless, plaintiffs are not entitled to summary judgment on liability. The affirmation of defendants' medical expert raises an issue of fact as to whether defendants' negligence was the proximate cause of S.T.'s injuries.
Background 
S.T. was born on March 15, 2002. The Administration for Children's Services placed S.T. in a foster placement with plaintiff soon after he was born, and she adopted him in 2007. [*2]S.T. moved into plaintiff's Section 8 apartment less than two weeks after his birth and has continuously resided there. The apartment is located in a building that was built before 1960.
In November 2003, the New York City Housing Authority (NYCHA) conducted its annual inspection of the apartment. By letter dated November 8, 2003, NYCHA directed defendant landlord L.B. Associates LLC to correct one condition in the bathroom, described by the inspector as "TUB CHIPPED/FINISH DAMAGED." The landlord corrected the condition.
On September 13, 2004, when S.T. was 2 1/2 years old, he was diagnosed with lead poisoning after a blood test revealed that his blood lead level was 40 micrograms per deciliter of blood (ug/dL)[FN1]. On September 17, 2004 his blood lead level was 30 ug/dL; on October 20, 2004 his blood lead level was 15 ug/dL; and on December 20, 2004 his blood lead level was 11 ug/dL.
As a result of S.T.'s high blood lead level, the New York City Department of Health and Mental Hygiene (DOH) intervened to assist the family through its "Lead Poisoning Prevention Program." DOH conducted lead testing at the apartment on September 21, 2004 and discovered 47 positive findings of lead paint throughout the apartment. DOH also determined that for 29 readings the condition of the paint in the apartment was "poor." On October 6, 2004, DOH ordered defendant L.B. Associates LLC. to abate the lead paint hazard.
In response to DOH's order to abate, defendants hired a contractor, JMJ Construction Corp. On October 16, 2014, DOH re-visited the apartment and issued an Intervention Report (Report). The Report noted that the "family is being moved to a safehouse." The Report also indicated that no abatement work had started and "all violations are not complied with by evidence of lead stamps on violative areas." Thus, the inspector noted a "Failure to comply with Commissioner's Order."[FN2] JMJ Construction Corp. completed the abatement on October 29, 2004 and DOH certified the abatement as complete on November 23, 2004.
The Testimony 
In her deposition testimony and her affidavit submitted to Supreme Court the mother described her unsuccessful efforts to have defendants address the deteriorated, cracked, and peeling paint in the apartment. The mother explained that she was fearful of letting S.T. out of his crib because the apartment walls were cracking, paint chips fell on the floor, and she saw S.T. place his fingers in his mouth after touching a deteriorated wall. Although the landlord's [*3]principal, Irvin Yasger, personally came to the apartment every month to collect rent, the mother averred that he did not want to make repairs [FN3]. She described enlisting the help of the building superintendent Antonio Abad and S.T.'s foster care caseworker Martiza Ramirez in an effort to get the landlord to address her complaints.
The superintendent, who submitted an affidavit in support of plaintiffs' motion, stated the apartment was "in bad shape." He asserted that Irvin Yasgur refused to allow him to paint the apartment because the landlord was worried about the cost. He averred that Irvin Yasgur was concerned that if the superintendent painted plaintiffs' apartment, then all the tenants would want to have their apartments painted. According to both the superintendent and the mother, Irvin Yasgur looked at the apartment on one occasion. However, they both explained that no repairs were made, despite the deteriorated conditions, because Irvin Yasgur said the apartment was "fine." The superintendent also averred that "[o]ver the years a number of apartments had lead in them and kids got sick but he wouldn't paint until after the City made him."
At her deposition, the foster care caseworker testified that she made home visits to the apartment between 2002 and 2007 and confirmed that the apartment paint was chipped and peeling. She also testified that she met the superintendent at the apartment on one occasion to show him the conditions and to relay the mother's concerns, including the mother's reluctance to allow S.T. out of his crib for fear that he would eat paint chips from the floor.
Irvin Yasgur's son testified that his father was the building manager who was responsible for all day-to-day operations. The son explained that his involvement with the building was occasionally signing or writing disbursement checks and driving his father to the building where the son would "[s]ometimes" but "[n]ot that often" get out of the car. While he testified "I don't know" or "I don't recall" at his deposition approximately 189 times, he testified to his father's general practices. According to the son, his father had a general practice of painting apartments "upon vacancy or every three years, or to address specific problems that might arise in the interim." However, he admitted that "I don't know what my father did with this particular building." The son further testified that his father had a general practice of checking for peeling paint but conceded "I don't know specifically."
The Summary Judgment Motion 
In support of their motion for summary judgment on liability, plaintiffs submitted the mother's affidavit and deposition testimony, the deposition testimony of S.T.'s foster caseworker, the affidavit of the building superintendent, and the deposition testimony of the landlord's son. Plaintiffs asserted that the evidence demonstrated that defendants knew about the broken, cracked, and peeling paint throughout the apartment when S.T. came to live there and that they failed to take reasonable steps to abate the hazardous condition. Plaintiffs submitted various documents with their motion, including a City of New York Housing Preservation & Development (HPD) Violation Summary Report reflecting "OVERDUE" or "LATE CERTIFIED" lead-based paint violations in over one dozen apartments in the building in 1999, 2004, and 2005 [FN4]. In addition, plaintiffs submitted the affirmations of a medical expert, a [*4]toxicologist, and a psychologist all supporting plaintiffs' claim that as a result of S.T.'s exposure to lead paint, he sustained permanent brain damage as well as cognitive and behavioral deficits.
In opposition, defendants submitted the affirmation of their medical expert, who opined that S.T.'s injuries were not caused by lead exposure. Rather, the expert attributed S.T.'s injuries to his biological mother's use of cocaine and Xanax while pregnant and genetic inheritance of low intelligence and psychiatric disorders. Defendants also submitted a printout entitled "Housing Quality Standards" to support their argument that NYCHA's November 2003 inspection "necessarily" included a lead paint inspection [FN5]. The most likely inference of the inspector's failure to identify a lead paint hazard, defendants claimed, was that they properly maintained the apartment and timely responded to complaints prior to the abatement order.
After considering the relevant testimony, Supreme Court denied plaintiffs' motion for summary judgment on liability holding that a question of fact exists as to whether "defendants took reasonable measures to correct the condition." Supreme Court further reasoned that the NYCHA inspection "which showed no indication of lead paint is a fact that goes to the reasonableness of defendant's actions." However, Supreme Court found that "as a matter of law the defendants were on notice of the alleged lead paint in the subject apartment."
Discussion 
Local Law 1, adopted by the New York City Council in 1982, amended Administrative Code of City of NY § 27-2013 by adding a new subdivision [h]. The law required that the landlord "remove or cover" hazardous lead paint in a manner approved by HPD (Administrative Code § 27-2013[h][1]). HPD's implementing regulations were codified in 28 RCNY Chapter 11.
The law included the following presumption of lead content:
"In any multiple dwelling erected prior to January first, nineteen hundred sixty in which paint or other similar surface-coating material is found to be peeling on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age or under reside, it shall be presumed that the peeling substance contains more than 0.5 percent of metallic lead based on the non-volatile content of the paint or other similar surface-coating material or having a reading of 0.7 milligrams of lead per square centimeter or greater."
(Administrative Code former § 27-2013[h][2]).[FN6]
A plaintiff can establish a prima facie case of liability under Local Law 1 by demonstrating that a) the subject premises was built before January 1, 1960; b) the plaintiff suffered injuries from lead poisoning as a consequence of the ingestion of lead-based paint in the premises; c) the plaintiff was six years old or younger when exposed to the lead-based paint; d) the landlord and/or owner had actual or constructive notice that the plaintiff was six years old or younger while residing in the premises (see Juarez v Wavecrest Mgt. Team , 88 NY2d 628 [1996]).
Local Law 1 does not impose absolute liability (id. at 643). Rather, it imposes a standard of reasonableness. To avoid liability, a landlord must prove that even though it violated Local Law 1, it acted reasonably under the circumstances (id . at 644). That is, the landlord must demonstrate that the lead paint hazard existed "despite his diligent and reasonable efforts to prevent it" (id. [internal citation omitted]). Although the issue of reasonableness is often a jury question, we have decided the issue as a matter of law when warranted by the undisputed facts (see e.g. Velez v Stopanjac , 273 AD2d 22, 22 [1st Dept 2000] ["defendants failed to properly inspect the apartment and take reasonable measures to alleviate the lead contamination"]; Miller v 135 Realty Assoc. , 266 AD2d 112, 113 [1st Dept 1999] ["[d]efendants' cursory inspections of the apartment, which did not include any tests for the presence of lead, and their belated and inadequate attempts to abate the lead-based paint condition did not meet the standard of reasonableness"]).
Here, plaintiffs established a prima facie case of liability under Local Law 1. Contrary to Supreme Court's conclusion, defendants did not raise an issue of fact as to whether they acted reasonably. The evidence establishes that defendants failed to act reasonably as a matter of law. Nevertheless, plaintiffs are not entitled to summary judgment because the affirmation of defendants' medical expert raises an issue of fact as to whether defendants' negligence was the proximate cause of S.T.'s injuries.
On appeal defendants contend that they "never observed or were informed that any of the previously intact paint had begun to peel." They expend considerable effort in disputing the wealth of evidence establishing that they were aware of peeling paint and that they failed to respond to the mother's repair requests. On one hand, defendants cite the mother's testimony with approval as demonstrating that "each complaint was promptly addressed and fixed by the superintendent." They highlight the mother's testimony that the entry hallway was fixed one week after she complained. On the other hand, defendants attack the mother's "poor" recollection of when she made complaints, faulting her for not recalling "the year, month, day or date of any complaint made to the superintendent." Thus, despite the mother's statement in her purportedly "self-serving" affidavit that she started complaining before S.T. moved into the apartment, defendants assert that the mother's deposition testimony "confirms that her first complaint was not until the infant plaintiff was approximately one and a half years old." Defendants also point to inconsistencies in the mother's testimony and maintain that January and [*5]February 2003 repair records undermine her statements [FN7]. Further, defendants assert that the mother's credibility as well as the credibility of the allegedly disgruntled former superintendent should be evaluated by a jury. While defendants do not attack the foster care caseworker's credibility, they argue that her testimony fails to properly identify the specific locations of where she observed peeling paint in the apartment.
Defendants' arguments are without merit. Under Local Law 1 defendants' liability is not predicated on their observations of peeling paint or whether they are informed of it. Defendants' liability does not depend on the mother demonstrating that she credibly complained about each and every instance or location of peeling paint. Even assuming that the mother never complained about the paint condition, defendants are charged with notice of the hazardous lead-based paint condition under Local Law 1 from the time that defendants were aware that S.T. moved into apartment. Moreover, Local Law 1 imposes on landlords "a specific duty to ameliorate hazardous levels of lead-based paint" (Juarez, 88 NY2d at 643). Defendants cannot avoid liability by attempting to shift their statutory obligation to the mother by questioning her memory or her credibility, or for failing to inform them when the paint began to peel. Shifting the burden to the mother is inconsistent with the purpose of Local Law 1 which "is unquestionably intended to protect a definite class of persons [plaintiffs] from a particular hazard they are incapable of avoiding themselves" (id. at 643-644).
We also reject defendants' arguments that they acted reasonably by "respond[ing] to complaints or requests received prior to the abatement order" as opposed to being proactive in the face of their presumed knowledge of the hazardous condition since March 2002. In any event, defendants' alleged responsiveness is belied by the record.
Even assuming that NYCHA conducted an appropriate lead paint inspection and that no lead paint condition existed as of November 8, 2003, there is no evidence that defendants took any reasonable measures to address the lead paint condition during the nearly 11 month period between the NYCHA inspection and DOH's discovery of lead paint violations. During this 11-month window, defendants' Summary of Work/Repair History for the apartment reflects that the sole repair (which was made one month after the NYCHA inspection) involved a $75.00 replacement of a bathroom door, lock and hinge and a repair of the existing bathroom door frame. This minor $75.00 repair cannot be equated to reasonable measures to prevent and correct a hazardous lead paint condition (see e.g. Velez , 273 AD2d at 22; Miller, 266 AD2d at 113)[FN8]. Infrequent and cursory attempts to repair discrete and isolated areas of an apartment do not raise an issue of fact that the hazard existed despite the landlords' "diligent and reasonable efforts to prevent it" (Juarez, 88 NY2d at 644 [internal quotation marks omitted]). Notably, defendants' claim that they acted reasonably is seriously undermined by the HPD printout reflecting numerous lead paint violations in over one dozen apartments in the building.
Nor do we find persuasive defendants' argument that they acted reasonably because they "promptly hired a contractor" after being ordered to abate the hazard. This argument ignores that where a defendant has "knowledge that a child under seven resided in the apartment, it may be charged with notice of the lead hazard prior to receipt of the Order [to abate]" (Juarez, 88 NY2d at 648). Hiring a lead abatement contractor after a child is poisoned does not satisfy the standard [*6]of reasonableness because the standard requires that the landlord act reasonably in preventing the lead hazard. A landlord cannot wait for DOH to issue an abatement order and then claim that it acted reasonably because the landlord is charged with avoiding "the severity of the medical damage created, and the personal, social, and economic costs [lead poisoning] imposes" (id . at 641 [internal quotation marks omitted]).
While no issue of fact exists as to whether defendants acted reasonably, defendants have raised an issue of fact as to causation. Plaintiffs highlight that defendants do not contend that S.T. was exposed to lead outside of the apartment. While that is true, defendants' medical expert opined that S.T.'s injuries were not caused by lead exposure. Contrary to plaintiffs' argument, the medical expert did not contest the extent of plaintiffs' injuries. Rather, the expert contested whether S.T. sustained any injury at all as a result of his lead poisoning.
Accordingly, the order of the Supreme Court, Bronx County (Paul L. Albert, J.), entered on or about March 8, 2019, which denied plaintiffs' motion for partial summary judgment should be affirmed, without costs.
All concur.
Order, Supreme Court, Bronx County (Paul L. Albert, J.), entered on or about March 8, 2019, affirmed, without costs.
Opinion by Moulton, J. All concur.
Acosta, P.J., Kapnick, Moulton, González, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JUNE 25, 2020
CLERK



Footnotes

Footnote 1:New York State's Health Law provides that the term "[e]levated lead levels" means "a blood lead level greater than or equal to ten micrograms of lead per deciliter of whole blood or such blood lead level as may be established by the department pursuant to rule or regulation" (Public Health Law § 1370[6]). New York City Health Code (24 RCNY 11.03) defines lead poisoning as a blood level of 10 ug/dL or higher (see also 10 NYCRR 67-1.1[e]). As of May 2012, the CDC updated its guidelines to recommend public health intervention when a child's blood lead level is greater than or equal to 5 ug/dL, instead of the CDC's 1991 standard of greater than or equal to 10 ug/dL (see www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm [last accessed Apr. 14, 2020]).

Footnote 2:The Report reflected that the contractor informed DOH that they did not start the work because they were waiting for the City to relocate the family.

Footnote 3:Irvin Yasgur was the principal of the owner and the property manager of the building. He passed away in August 2007 before plaintiffs commenced this action.

Footnote 4:The HPD Report reflects violations for S.T.'s building and an attached building, which were both owned by defendants under the same block and lot number. Defendants owned the buildings from July 13, 1995 through March 29, 2006.

Footnote 5:The printout, which is dated five years after the inspection, states that "[d]uring inspection, NYCHA inspectors will check for the presence of lead-based paint." On appeal defendants no longer point to the printout but surmise that NYCHA must have conducted a lead paint inspection because 24 CFR 882.109(i)(2) provides that an inspector is required to look for defective paint surfaces.

Footnote 6:Local Law No. 38 (1999) of the City of New York (Local Law 38) replaced Local Law 1. The Court of Appeals declared Local Law 38 null and void in 2003 based on a failure to comply with SEQRA (see Matter of New York City Coalition to End Lead Poisoning v Vallone , 100 NY2d 337, 349-350 [2003]). As a result, Local Law 1 was revived (id . at 350). As of August 2, 2004, Local Law No. 1 (2004) of the City of New York went into effect, repealing Local Law No. 1 (1982) and its predecessor Local Law No. 50 of 1972, and formally repealing the invalidated Local Law 38. Local Law No. 1 (2004) does not contain a directive that the landlord "remove or cover" the lead paint hazard but it obligates the landlord to "take action to prevent the reasonably foreseeable occurrence of such a condition and shall expeditiously remediate such condition and any underlying defect" (Administrative Code § 27-2056.3).

Footnote 7:Defendants' Summary of Work/Repair History for the apartment reflects that the cost of the work done in January 2003 was $175.00 and the cost of work done in February 2003 was $315.00. 

Footnote 8:By contrast, defendants' Summary of Work/Repair History reflects that the cost of the lead paint abatement was $7,500.